**Marquis DeMichael KELLY, Appellant**

**v.**

**The STATE of Texas, Appellee**

**No. 06-16-00185-CR**

Court of Appeals of Texas, Texarkana.

Date Submitted: June 23, 2017

Date Decided: August 31, 2017

---

**8.** *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.028 (West 2002).

506

Jeff Jackson, Attorney at Law, 736–A Hwy 259 N, for appellant.

John J. Roberts, Assistant District Attorney, 101 E Methvin St., Ste. 333, Longview, TX 75601, for appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Burgess

On February 22, 2016, police officers from the Longview Police Department executed a search warrant at a duplex leased to Marquis DeMichael Kelly located at 209 Mitchell Street in Longview, Gregg County, Texas. Kelly and Arthur Perry were seated in recliners at the duplex when the police entered the residence. The officers located a large amount of marihuana, cocaine, and Ecstasy[1] at the duplex, much of it on a table between the two recliners. The officers also found two pistols, each within reach of the two men. Kelly was subsequently convicted of possession with intent to deliver four or more, but less than 200, grams of a Penalty Group 1 controlled substance, possession with intent to deliver four or more, but less than 400, grams of a Penalty Group 2 controlled substance, and one count of possession of a

---

1. Ecstasy is "a common or 'street' term describing 3,4–methylenedioxy methamphet- amine." *Brenes v. State*, 488 S.W.3d 384, 387 n.5 (Tex. App.—Texarkana 2016, pet. ref'd).

firearm by a felon. For the reasons set forth below, we affirm the trial court's judgment.

## I. Issues Presented

Kelly raises four points of error on appeal. First, he challenges the sufficiency of the evidence supporting his convictions for possession of controlled substances with the intent to deliver. Second, he challenges the trial court's ruling that the chain of custody was sufficient to admit the drug evidence against him. Third, he argues that the trial court erred in overruling his objection to the in-court identification of him by a witness. Finally, he argues that the trial court erred in denying his motion to suppress evidence. We will address Kelly's points of error in reverse order.

## II. The Trial Court Did Not Err In Denying Kelly's Motion to Suppress Evidence

### A. Standard of Review

A trial court's ruling on a motion to suppress is reviewed for abuse of discretion. *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). In performing this review, we apply "a bifurcated standard of review." *Myrick v. State*, 412 S.W.3d 60, 63 (Tex. App.—Texarkana 2013, no pet.) "[A]s a general rule, the appellate courts ... afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact-findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,'[2] also known as 'mixed questions of law and fact,'[3] if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* We conduct a de novo review of the trial court's decisions applying applicable laws. *See Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000).

When a motion to suppress is based on an argument that the search warrant's supporting affidavit is deficient,

a reviewing court may look only to the four corners of the supporting affidavit, [but] the reviewing court should view the magistrate's decision to issue the warrant with great deference. After reviewing the supporting affidavit in "a commonsensical and realistic manner," a reviewing court must uphold the magistrate's decision so long as the magistrate had a substantial basis for concluding that probable cause existed.

*Jones v. State*, 364 S.W.3d 854, 857 (Tex. Crim. App. 2012) (footnotes omitted) (quoting *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011)).

Although this review does not mean the reviewing court should be a "rubber stamp," "the magistrate's decision should carry the day in doubtful or marginal cases, even if the reviewing court might reach a different result upon *de novo* review."

*Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (quoting W. LaFave, *Search and Seizure: A Treatise on the Court Amendment* § 11.7(c) at 452 (4th ed. 2004 & Supp. 2009-2010)).

### B. Analysis

The basis of Kelly's motion to suppress, both to the trial court and on appeal, was that the search warrant was stale. Kelly bases his argument on two

---

**2.** *Villarreal v. State*, 935 S.W.2d 134, 141 (Tex. Crim. App. 1996) (Clinton, J., concurring).

**3.** *Id.* at 139 (McCormick, P.J., concurring).

statements from the supporting affidavit of Longview Police Officer Alejandro Castillo. In his affidavit, Castillo testified that "[w]ithin 72 hours of the date of this affidavit [February 22, 2016], [Castillo] received information from a cooperating individual [CI]" who had observed Kelly or his co-defendant, Thompson, in possession of what the CI believed was cocaine "within the past 72 hours before giving [Castillo] this information...." Kelly argues that under a plain reading of the search warrant affidavit, the CI observed the information within seventy-two hours before giving it to Castillo and that Castillo obtained the affidavit within seventy-two hours after receiving the CI's information. Thus, Kelly concludes that the warrant was stale because it was based on information possibly obtained 144 hours before the warrant was executed.[4]

 Yet, even if we assume that the information supporting the warrant was obtained 144 hours before the warrant was executed, mere passage of time is not the only factor we consider in deciding whether a warrant is stale. As the Court of Criminal Appeals has stated, "The hare and the tortoise do not disappear over the hill at the same speed. The likelihood that the evidence sought is still available and in the same place is a function, not just of the watch or the calendar, but of the particular variables in the case." *Crider v. State*, 352 S.W.3d 704, 707–08 (Tex. Crim. App. 2011). Thus, in evaluating whether a warrant for the search and seizure of drugs is stale, we also consider

(1) the type of crime[—]short-term intoxication versus long-term criminal enterprises or conspiracy[—](2) the sus-

pect—"nomadic" traveler, "entrenched" resident, or established ongoing businessman[—](3) the item to be seized—"perishable and easily transferred" (evanescent alcohol, a single marijuana cigarette) or of "enduring utility to its holder" (a bank vault filled with deeds, a "meth lab," or a graveyard corpse)[—]and (4) the place to be searched—a "mere criminal forum of convenience or secure operational base."
*Id.* at 708.

With respect to the first factor, although this was a drug crime, the manner in which the drug offense occurred suggested a continuing criminal enterprise rather than a one-time offense. The affidavit reveals that when the CI witnessed cocaine at the duplex, Kelly told him that he "had more cocaine available at the suspected place, implying that additional deliveries of the illegal substance [were] probable." The affidavit also states that the "CI advised Affiant that he/she ha[d] observed ... Kelly ... in possession of cocaine and observed the sale of it to people." Also, the affidavit states, "Affiant has learned of two previous arrests wherein [Kelly] was charged with a drug offense." Finally, the affidavit states,

Affiant, while conducting surveillance at 209 Mitchell Street, has observed high vehicle traffic and foot traffic coming and going from this location and observed people in and out of the location. Affiant believes through my law enforcement training and experiences that this activity is common of illegal drug trafficking. Affiant observed ∴... Kelly ... at listed location at the time high vehicle traffic and foot traffic was observed.

---

4. Kelly does not argue that the warrant was stale because it was not executed within three days after it was issued as required by Article 18.07(a) of the Code of Criminal Procedure, nor can he on this record. *See* Tex. Code Crim. Proc. Ann. art. 18.07(a)(3) (West 2015). Rather, he argues that the warrant was stale because the information upon which it was obtained was too old by the time the warrant was executed.

In *Jones v. State*, Houston's First Court of Appeals recently noted that

facts indicating ongoing criminal activity have long been recognized as diminishing the importance of establishing a specific and immediate time period in the affidavit: "Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant."

*See Jones v. State*, 338 S.W.3d 725, 736–37 (Tex. App.—Houston [1st Dist.] 2011), *aff'd*, 364 S.W.3d 854 (Tex. Crim. App. 2012) (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)). The above-cited affidavit testimony tends to establish "activity of a protracted and continuous nature, a course of conduct." *Id.* Thus, the first factor supports the trial court's determination that the warrant was not stale and that probable cause existed.

The remaining factors support that conclusion as well. Regarding the second factor, the affidavit states,

CI advised Affiant that ... Kelly sometimes drives a grey Nissan Titan or sometimes drives a white four door Mercury passenger vehicle. CI advised [that Kelly] sometimes parks these vehicles at 210 Mitchell Street which is located directly across the street from 209 Mitchell Street. CI advised Affiant that 210 Mitchell Street is where the mother of [Kelly] lives.

Therefore, the affidavit suggests that Kelly is not a nomadic traveler, but is instead more like an entrenched resident. Although cocaine is a perishable and easily transferred substance, the affidavit states that "CI related that [Kelly] indicated in CI's presence that [he] had more cocaine

available at the suspected place, implying that additional deliveries of the illegal substance [were] probable." Finally, the fact that Castillo witnessed heavy automobile and foot traffic at the duplex as well as Kelly's presence while that traffic occurred suggests that the duplex was not a mere criminal forum of convenience, but was instead a secure operational base.

Consequently, considering the totality of the circumstances as reflected in the four corners of the search warrant affidavit, we find that the affidavit establishes there was a " 'fair probability' that contraband or evidence of a crime [would] be found in a particular place at the time the warrant [was] issued" regardless of the amount of time between Castillo's receipt of the CI's information and the execution of the warrant. *State v. Jordan*, 342 S.W.3d 565, 568–69 (Tex. Crim. App. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). We overrule Kelly's fourth point of error.

### III. The Trial Court Did Not Err In Overruling Kelly's Objection to Witness Trejo's In-Court Identification and Castillo's Out-of-Court Identification

#### A. Factual Background

Marco Trejo was Kelly's landlord. Trejo testified that, in January 2016, he rented the duplex apartment that was the subject of the search to a man calling himself John Martin. When Trejo asked Martin for identification, he showed Trejo "a form of identification, but it was done quickly.... [A]fter that, [Trejo] asked him for the ID form, [but] ... it was never provided to him." The lease was subsequently signed by "John Martin." Shortly after Kelly was arrested in the drug raid, Trejo saw Kelly's picture on a news posting and recognized him as the tenant who identified himself as John Martin.

Two days after the drug raid, Castillo saw a "For Sale" sign on the duplex's porch containing Trejo's telephone number. Castillo contacted Trejo at that number, and Trejo agreed to meet Castillo at the Gregg County Sheriff's Office. The next day as he and Castillo were entering an interview room, Trejo told Castillo that he had seen "the news and saw that the person who signed the lease agreement for the duplex was one of the persons who was arrested." Castillo clarified that he did not "solicit" this information, but that Trejo volunteered it as they walked into the interview room. Castillo also testified that, before the formal interview began, Trejo told him that the person he recognized in the news as his tenant was the son of the woman who lived across the street at 210 Mitchell Street.

Castillo testified that, because Trejo provided this information, he showed Trejo a news story from the local newspaper's webpage which contained pictures of the two suspects arrested during the drug raid. The State introduced the article into evidence as State's Exhibit 34. The article includes photographs of the two suspects positioned vertically on the page. Trejo told Castillo that the suspect depicted in the top photograph, whom the article identified as Marquis Kelly, was the person to whom Trejo had rented the west-side duplex apartment at 209 Mitchell Street.[5] Kelly argues in his third point of error that, by showing Trejo the news article, Castillo administered an impermissibly suggestive photographic line up to him that tainted the in-court identification. Therefore, he concludes that the trial court erred in admitting the in-court identification.

**B. Standard of Review And Issue Presented**

■ We have previously held that "[a] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Jones v. State*, 944 S.W.2d 50, 51 (Tex. App.—Texarkana 1997, pet. ref'd) (citing *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). Thus, "[d]etermining the admissibility of an in-court identification involves a two-step analysis: (1) whether the out-of-court identification procedure was impermissibly suggestive, and (2) whether the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification." *Mayfield v. State*, 152 S.W.3d 829, 831 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). With respect to the first factor, "[a] defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive." *Id.* at 832. In deciding this factor, we examine "the totality of the circumstances surrounding the identification." *Id.*

■ In this case, Castillo showed Trejo a newspaper article concerning the drug raid with Kelly's photograph, name, and a statement that he had been arrested for the offense for which he was charged. On this record, Kelly has demonstrated clear and convincing evidence that the out-of-court identification procedure was impermissibly suggestive. Accordingly, resolution of this case will turn on a consideration of the second factor.

---

5. Kelly timely objected to the in-court identification by Trejo. Because the trial court heard the case without a jury, it carried Kelly's objection and ultimately overruled the objec-

tion after hearing the testimony concerning the circumstances of Trejo's prior out-of-court identification with Castillo.

In considering the second factor,

> [F]ive non-exclusive factors should be "weighed against the corrupting effect of any suggestive identification procedures in assessing reliability under the totality of the circumstances": (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Id.* (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999)). Moreover, "[w]e are to consider the five ... factors, all issues of historical fact, deferentially in a light favorable to the trial court's ruling. The factors, viewed in this light, are then to be weighed de novo against 'the corrupting effect' of the suggestive pretrial identification procedure." *Id.* (citations omitted). Finally, "[e]ven when the procedure is impermissibly suggestive ... the in-court identification by an eyewitness is admissible if the record clearly shows that the witness's prior observations were sufficient to serve as an independent origin for the in-court identification." *Jones*, 944 S.W.2d at 52 (citing *Herrera v. State*, 682 S.W.2d 313 (Tex. Crim. App. 1984)).

## C. Analysis

In the present case, Kelly points to several factors that he believes demonstrate a substantial likelihood of irreparable misidentification. First, he notes that Castillo's reports contained no information stating that Trejo had seen the person he identified as Kelly after he signed the lease or that Trejo saw Kelly around the time of the arrest. Kelly further points to Trejo's testimony that his eyesight is not good and to the fact that Trejo had to step down from the witness stand to identify

Kelly at trial. Thus, Kelly concludes that "by showing Mr. Trejo only two photos of [Kelly], the police confirmed [Trejo's] pre-existing bias/belief that [Kelly] was the person that signed the lease under a fictitious name."

Nevertheless, Trejo testified that Kelly signed the lease agreement in his presence, that he had seen him on previous occasions because he lived across the street with his mother, and that he had seen Kelly driving a gray truck which he parked at his mother's home. Additionally, Trejo had seen Kelly and exchanged greetings with him for several years prior to the out-of-court identification. Accordingly, Trejo had a clear opportunity to view Kelly when he signed the lease and knew him prior to the out-of-court identification.

Consequently, the evidence establishes that the suggestive procedure did not give "rise to a very substantial likelihood of irreparable misidentification." *Mayfield*, 152 S.W.3d at 831. Even though the out-of-court identification was "impermissibly suggestive," the evidence "clearly shows that [Trejo's] prior observations were sufficient to serve as an independent origin for the in-court identification." *Jones*, 944 S.W.2d at 52. We overrule Kelly's third point of error.

## IV. The Trial Court Did Not Err In Finding the State's Chain of Custody Sufficient to Allow Admission of the Drug Evidence

In his second point of error, Kelly argues that, because law enforcement either did not generate a laboratory submission report, or failed to produce that report before trial, the State failed to prove the chain of custody for the copious amounts of illegal drugs seized in the raid and used as evidence against him. We find the record

has sufficient proof of the chain of custody and overrule this point of error.

## A. Standard of Review

 "We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). If the proponent of the evidence presents sufficient evidence for a reasonable fact-finder to conclude the evidence has been authenticated, there is no abuse of discretion. *See Pondexter v. State*, 942 S.W.2d 577, 586 (Tex. Crim. App. 1996). Moreover, "[w]ithout evidence of tampering, most questions concerning care and custody of a substance go to the weight attached, not the admissibility, of the evidence." *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997). Thus, "[w]here the State shows the beginning and the end of the chain of custody, any gaps in between go to weight rather than admissibility, particularly where the chain goes inside the laboratory." *Gallegos v. State*, 776 S.W.2d 312, 315–16 (Tex. App.—Houston [1st Dist.] 1989, no pet.) (citing *Medellin v. State*, 617 S.W.2d 229, 232 (Tex. Crim. App. [Panel Op.] 1981)).

## B. Analysis

 Officer Castillo described all the various items of evidence and contraband he found in Kelly's home when Castillo and other officers executed the search warrant.

Officer Bobby Clawson confirmed Castillo's role in the evidence gathering, stating, "Yes. We collect it, he compares with his notes or whatever, and it's packaged and goes to [the Department of Public Safety (DPS)]." Clawson testified that he took a submission form, together with the various suspected controlled substances seized at Kelly's home, to the DPS crime laboratory. When the drug laboratory analysis was completed, Clawson then retrieved the drugs from the DPS laboratory.

Castillo testified at length about each piece of evidence found in executing the search warrant. Castillo also reviewed pictures taken during the raid and described drugs and paraphernalia found in Kelly's house. He testified to the identifying numbers law enforcement assigned to each item of suspected controlled substance. He then connected those items to the exhibit numbers assigned by the State.

The DPS laboratory report bears Clawson's name and address with the Longview Task Force, states that the tested items were submitted by the Longview Task Force, and states that the items submitted were from an offense on February 22, 2016, which was the date of the raid. Kelly conceded that he had received a chain-of-custody report from the State that "list[ed] each and every exhibit and what was contained in that exhibit" and "the different items as they are logged in." Castillo testified that the law enforcement item numbers on the DPS laboratory report corresponded with the numbers on the chain-of-custody report. Finally, Kelly stipulated to the results of analyses contained in the DPS laboratory report.[6]

6. At the beginning of trial, Kelly told the trial court, "As far as the lab report, we don't have an objection once all the dots are—you know, chain of custody is done, we have no objection; and we will not require the State to provide that witness." While it might be argued that stipulating to the contents of the laboratory report moots any complaint about chain of custody, Kelly was clear he was preserving that argument, and the trial court clearly understood that argument.

Consequently, the record establishes that the State acquired the illegal drugs during the drug raid, checked the items in at the law enforcement facility, delivered the items to the DPS laboratory, and then retrieved those items from the DPS laboratory and delivered them to court. In addition, Officer Castillo reviewed photographs taken at the crime scene and identified the individual articles of evidence seized, which were consistent with the evidence produced at trial. Finally, the State produced the DPS report at trial.

Accordingly, there was sufficient evidence to support the trial court's conclusion that the State proved the drugs offered and admitted at trial were the drugs seized in Kelly's home. Therefore, the trial court did not abuse its discretion in admitting those drugs into evidence. The second point of error is overruled.

## V. The Evidence is Sufficient to Prove the Offenses of Possession of Controlled Substances With Intent to Deliver

We now turn to Kelly's complaint that the evidence is insufficient to prove he possessed the drugs at issue with the intent to deliver them.

### A. Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concur-

ring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Possession is defined as "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp. 2016). In cases where illegal drugs are not found on the defendant's person, but are instead found in an area to which the defendant and others had access, we look for several factors pointing to the defendant's participation in the illegal possession:

(1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006). "It is .... not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Id.*

### B. Analysis

There are several circumstances linking Kelly to the drugs which led to his conviction. Not only did Kelly lease the duplex, he and Perry were sitting comfortably in recliners inside the duplex when the search was conducted. Well within Kelly's reach and in plain view of the officers were several small packages of marihuana. On the table between the two chairs was a bottle of promethazine, a box of sandwich baggies, and a jar decorated with marihuana leaves that had marihuana in the bottom. Also present was a gold Versace box containing cash and a pill bottle in which were about nineteen small packets of cocaine or crack cocaine, which the DPS laboratory report listed as 17.92 grams. Another pill bottle on the table contained Ecstasy tablets or pills.

Also on the table between the two men were Swisher Sweet cigars—which in Castillo's experience were hollowed out of their tobacco, then filled with marihuana—as well as a digital scale used for weighing drugs. On the bottom shelf of the table was a red insulated lunch-bag, containing approximately two dozen Xanax pills, and a pill bottle with approximately 114 Ecstasy pills. On the floor behind the recliners, officers found a grinder, which Castillo testified was used to ground or cut marihuana preparatory to smoking. On the

floor behind the recliners, there was another bag of marihuana.

 More drugs were found in other areas of the house. On the couch opposite Kelly's and Perry's chairs was a Spiderman backpack containing a large bag of marihuana. Inside a kitchen cabinet, officers found a cigarette package containing cocaine. In one of the two bedrooms, the officers found Perry's identification card and another bag of marihuana.[7] The other room was mostly empty, except for a sunglass case on the floor containing sixteen packets of white powder and two sandwich bags containing chunks of white powder.[8]

Even before entering the home, the officers distinctly smelled "[a] very strong" odor of marihuana, and when officers breached the residence, Perry and Kelly evinced no surprise. According to Police Officer Shane Manion, who led the entry, "[T]hey did not move from the recliners. They didn't move their feet, they didn't move their hands, they didn't try to run, they didn't yell at us ... [R]eally they said nothing and were very docile."

Also inside the residence was a television monitor displaying live video from a surveillance camera mounted outside the front door. The front door's frame was outfitted with brackets on either side, and standing next to the door was a two-by-four board, apparently for use as a barricade to prevent entry. The back door was similarly rigged with the horizontal board in place, effectively barring entry into the residence through the back door. Both Kelly and Perry had pistols within reach,

---

7. "It is well settled though that an accused may with another or others jointly possess dangerous drugs or narcotics and that such possession need not be exclusive." *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985).

8. The DPS crime laboratory did not analyze every specimen of suspected narcotic submitted, nor did they test the marihuana. A police officer may testify to the smell of marihuana based on his or her experience. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

and both guns were loaded with full magazines and bullets in the chambers.

On the other hand, the house had none but the most basic furnishings. The refrigerator was empty and not operating. The cabinets were empty, except for a small decorative teapot, perhaps one can of some kind of food, and a cigarette box and pill bottle containing crack cocaine. There was essentially no food in the kitchen. Castillo testified that this circumstance was common to "trap houses," which he described as houses used for the sale of illegal drugs, rather than as residences where people actually live.

The logical force of all the evidence supports a finding that Kelly possessed the narcotics as alleged in the indictment with an intent to deliver the drugs. There being sufficient evidence to link Kelly to possession with intent to deliver narcotics as charged, we overrule the first point of error.

## VI. Conclusion

For all the foregoing reasons, we affirm the trial court's judgment.

