

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00069-CR

TAJMON LATERRANNCE ROBINSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CR2022-0450

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

After watching a recorded confession, a Wichita County[1] jury convicted Tajmon Laterrannce Robinson of the capital murder[2] of Floyd Kirt, a clerk at a local Stripes convenience store. For that offense, the trial court sentenced Robinson to life imprisonment without parole.

On appeal, Robinson argues that the trial court erred by admitting a thirty-second clip from his recorded confession that showed him becoming upset after the officers who collected his confession left the room. Robinson also argues that the trial court erred by admitting a recording of an incriminating jailhouse call he made to his mother. On appeal, we conclude that the trial court did not err by any of its evidentiary rulings. As a result, we affirm the trial court's judgment.

I.       Factual Background

The record establishes that Kirt was killed in the early morning hours of February 12, 2022. At 4:45 a.m., a Stripes customer, Amanda Clawson, testified that she found Kirt's lifeless body behind the counter and called 9-1-1. According to Dr. Brianne Flynn, Kirt's autopsy showed that he died after suffering four gunshot wounds. Officers from the Wichita Falls Police Department (WFPD) quickly arrived at the scene but were unable to locate the murderer, who had fled.

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We are unaware of any conflict between precedent of the Second Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 19.03 (Supp.).

To facilitate a lead, David Raines, an officer with the WFPD, obtained surveillance footage from Stripes that recorded the killing with fair clarity. According to Raines, the footage showed that the suspect was an African-American male who was approximately six feet tall with a slender build of "maybe 150 to 170" pounds. The suspect was wearing a grey hoodie and black Nike shoes with white embellishments. To help identify the suspect, the WFPD released still shots and a short clip of the surveillance video, without any audio, to the public.

John Laughlin, a detective with the WFPD, testified, and the surveillance footage showed, that the suspect entered the store and informed Kirt that he needed to use the restroom. After doing so, the suspect walked to the counter as he pulled out a semi-automatic handgun outside of Kirt's view and asked for a pack of Newport Short cigarettes. As Kirt was handing the cigarettes over, the suspect pointed his gun at Kirt and asked him to open the safe. When Kirt attempted to defend himself, the suspect shot Kirt several times, causing him to fall to the floor behind the counter. As Kirt bled out on the floor, the suspect grabbed the keys to the safe that was located behind the counter, removed its contents, grabbed a handful of lottery tickets, and fled the scene. Laughlin located a 9-millimeter cartridge, three bullet slugs, an unscratched lottery ticket, and a pack of Newport Short cigarettes as possible evidence. Without further evidence, it was up to the public to help the WFPD identify the suspect.

A lead soon came in from Amelia Corona, Robinson's former roommate, after she watched news footage containing the still photos and short video clip of the suspect. Corona testified that she lived in an apartment with her best friend, Taesheonna Johnson, and her boyfriend, Robinson. According to Corona, Johnson had ended the relationship with Robinson

3

and had moved out. After Johnson had already left, Corona asked Robinson, on the day before the murder, to move out of the apartment. When Robinson did not leave, Corona called the police.

Caleb Hopkins, an officer with the WFPD, responded to Corona's call. Hopkins testified that Corona wanted to have Robinson barred from the apartment, but Robinson chose to leave instead. Hopkins testified that Robinson was carrying a grey hoodie or jacket and a backpack stuffed with items.

Corona testified that, when she saw the images released by the WFPD, she realized that Robinson was wearing the same clothing he wore when he left the apartment. Specifically, she remembered that he wore black and white Nike shoes like the ones in the Stripes surveillance footage. Corona also said that Robinson had a handgun in his pocket when he left the apartment. In front of the jury, Corona identified Robinson as the suspect depicted in the surveillance footage.

From Corona's lead, the WFPD began investigating Robinson, who they discovered was a former employee of Stripes. Five days after the murder, on February 17, the WFPD arrested Robinson and conducted a recorded custodial interview, which was played for the jury. During the interview, Robinson confessed to murdering Kirt. During his confession, Robinson provided details of the crime not released to the public,[3] including that he had gone to the bathroom, asked Kirt for Newport Short cigarettes, grabbed lottery tickets before fleeing the scene, and dumped

_____

[3]Raines testified that the WFPD only released a short clip of the surveillance footage without any audio so that, if "someone [made] a confession, [they could] compare that to the evidence that [they had] and see if [it was] a true confession versus a false confession."

4

lottery tickets outside of the convenience store while escaping. When asked about the Nike shoes, Robinson said he had given them away. According to Laughlin, on February 25, the unscratched lottery tickets dropped outside of Stripes were located based on Robinson's description of where he had left them.

At trial, Johnson testified that she remembered purchasing black and white Nike shoes for Robinson while they were dating. Johnson testified, under oath, "[H]e texted me, like, 11 the morning that he did - - that he killed that man, he texted me. And this is before I even knew that it was him."

Another of Robinson's ex-girlfriends, Bresia Johnston, testified that she dated Robinson while he was working at Stripes. According to Johnston, Robinson had commented that, "if he wanted to rob the place, he could. He knew about the safe."

Tariq Jones, who went to the same high school as Robinson, testified that he had lost touch with Robinson but later reconnected via Facebook. Jones testified that Robinson went by the name "Solo Tazz" on Facebook and that, on February 9, 2022, Solo Tazz sent him a photo of a weapon, which he called "[a] nine." Jones testified that Robinson came to stay with him and that, as a result, he knew that Robinson kept a gun in his pocket. Kevin Callahan, a firearms and toolmark examiner with the Texas Department of Public Safety, testified that he examined the evidence gathered from the crime scene at Stripes. According to Callahan, "two cartridge cases were fired in a firearm capable of firing a nine millimeter Luger."

After hearing the evidence against Robinson and watching his recorded confession, the jury convicted him of Kirt's murder.

## II. The Trial Court Did Not Err by Its Evidentiary Rulings

By two points of error, Robinson challenges the trial court's evidentiary rulings.

### A. Standard of Review

"We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). "A trial court does not abuse its discretion if the decision to admit evidence is within the 'zone of reasonable disagreement.'" *Price v. State*, 594 S.W.3d 674, 679 (Tex. App.—Texarkana 2019, no pet.) (quoting *Bradshaw v. State*, 466 S.W.3d 875, 878 (Tex. App.—Texarkana 2015, pet. ref'd)). "If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed." *Id.* (quoting *Bradshaw*, 466 S.W.3d at 878). "In determining whether the trial court abused its discretion, '[w]e may not substitute our own decision for that of the trial court.'" *Id.* (alteration in original) (quoting *Bradshaw*, 466 S.W.3d at 878).

### B. The Trial Court Did Not Abuse Its Discretion by Admitting the Thirty-Second Clip

Outside of the jury's presence, Robinson objected to a portion of Robinson's recorded confession, "54:22 through 54:5[2] on the time stamps," which showed him "sort of acting out in the interview room after the police leave." Robinson explained that the footage, which showed him punching a chair and knocking it over and punching the wall or inanimate object, was substantially more prejudicial than probative. The trial court overruled Robinson's objection, allowing the jury to see the thirty-second clip. After the clip was played, Laughlin testified,

6

without objection, that Robinson's demeanor had changed during the clip because he was "upset . . . about the situation that he [found] himself in, obviously."

In his first point of error on appeal, Robinson argues that the trial court erred by allowing the jury to see the change in his demeanor, over his Rule 403 objection. *See* TEX. R. EVID. 403. When conducting a Rule 403 balancing test, a court:

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In any given case, "these factors may well blend together in practice." *Id.* at 642. Ultimately, "Rule 403 favors admissibility, and 'the presumption is that relevant evidence will be more probative than prejudicial.'" *Davison v. State*, 602 S.W.3d 625, 652 (Tex. App.—Texarkana 2020, pet. ref'd) (quoting *James v. State*, 555 S.W.3d 254, 260 (Tex. App.—Texarkana 2018, pet. dism'd, untimely filed).

Although Robinson argues that the thirty-second clip had little probative value, we find that the clip was particularly probative in light of Robinson's defensive theory, which was that he gave a false confession. During opening statement, Robinson's counsel argued that the WFPD had no DNA evidence, no fingerprints, no murder weapon, and no clothing from the suspect. He then said, "And then we have what I call a spoon-fed confession." Counsel argued that the WFPD "brought [Robinson] to the interview room where he denie[d] and denie[d] until,

7

eventually, the police spoon-[fed] him bits and bits, he says, Yeah, yeah, I did that." Counsel emphasized for the jury when wrapping up his opening statement that "false confessions exist."

Turning to the *Gigliobianco* analysis, in light of Robinson's defensive theory, the trial court could decide that the thirty-second clip, in which Robinson appeared to be weighing the gravity of his confession, had considerable probative value because his demeanor while officers were not in the room would aid the jury in deciding whether Robinson's confession was false. Because the State had no DNA or fingerprint evidence connecting Robinson to the scene and no eyewitnesses to the killing, the trial court could find that the State's need for the clip to rebut the defensive theory of a fabricated confession was great. As a result, the trial court did not abuse its discretion by finding that the first two *Gigliobianco* factors weighed in favor of admitting the evidence.

As for the third *Gigliobianco* factor, while Robinson argues that the clip tended to suggest a verdict of guilt based on violent character, the trial court could find it highly unlikely that the jury would find Robinson's outburst toward inanimate objects amounted to a propensity of violence toward people. Under the fourth factor, the trial court could reason that the clip would not distract the jury from the main issue in the case, which was whether Robinson murdered Kirt, especially considering that its jury charge refocused the jury on the main issue.

"The fifth factor refers to evidence such as highly technical or scientific evidence that might mislead the jury because it is not equipped to weigh the probative force of the evidence." *Price*, 594 S.W.3d at 681 (citing *Gigliobianco*, 210 S.W.3d at 641). Here, the clip was neither

8

scientific nor technical and pertained to matters that could easily be understood by a jury. *See id.* We find that the fifth factor weighed in favor of admission.

Lastly, we conclude that there was no likelihood of the thirty-second clip "consum[ing] an inordinate amount of time or merely repeat[ing] evidence already admitted." *Gigliobianco*, 210 S.W.3d at 641–42.

We find that the trial court, after balancing the Rule 403 factors, could have reasonably concluded that its probative value was not substantially outweighed by the danger of unfair prejudice and the other factors in Rule 403. Consequently, we find that the trial court did not abuse its discretion by admitting the clip into evidence. As a result, we overrule Robinson's first point of error.

## C.     The Trial Court Did Not Err by Admitting the Jailhouse Call

In his second point of error, Robinson argues that the trial court erred by admitting an audio recording of his jailhouse call with his mother. Robinson argues that the jailhouse call was not properly authenticated, triggering Rule 901(a) of the Texas Rules of Evidence, which states, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). The rule "does not require the State to *prove* anything. It requires only a showing that satisfies the trial court that the matter in question is what the State claims; once that showing is made, the exhibit is admissible." *Garner v. State*, 939 S.W.2d 802, 805 (Tex. App.—Fort Worth 1997, pet. ref'd). Rule 901 "has been aptly described as a 'liberal standard of admissibility.'" *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (citing

9

CATHY COCHRAN, TEXAS RULES OF EVIDENCE HANDBOOK 922 (7th ed. 2007–08)). "Moreover, '[w]ithout evidence of tampering, most questions concerning care and custody of a substance go to the weight attached, not the admissibility, of the evidence.'" *Kelly v. State*, 529 S.W.3d 504, 513 (Tex. App.—Texarkana 2017, no pet.) (alteration in original) (quoting *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997)).

Rule 901(b) describes various methods that can be used to authenticate evidence, including providing testimony from a witness who has knowledge of evidence stating that "an item is what it is claimed to be." TEX. R. EVID. 901(b)(1). "The State could [also] satisfy its authentication requirement by providing an opinion identifying [Robinson's] voice which was 'based on hearing the voice at any time under circumstances that connect it with the alleged speaker.'" *Woodberry v. State*, No. 05-18-00728-CR, 2019 WL 2863867, at *7 (Tex. App.—Dallas July 2, 2019, no pet.) (mem. op., not designated for publication) (quoting TEX. R. EVID. 901(b)(5)); *see Martinez v. State*, No. 08-19-00046-CR, 2021 WL 804181, at *6 (Tex. App.—El Paso Feb. 10, 2021, no pet.) (not designated for publication).

Here, the State sought to introduce Robinson's jailhouse call through Donnie Cavinder, a deputy chief investigator for the Wichita County District Attorney's Office. Cavinder testified that the jail used a telephone system called Global Tel-Link, which inmates could access with a personal pin. Cavinder said he was familiar with Robinson's pin, Robinson's voice, and the voice of his mother, Cherie Govan. After Cavinder testified that the recording of the call was "a fair and accurate copy of the phone call . . . pulled off the system" and that he could identify all

10

the voices on the call as Robinson and his mother, the trial court overruled Robinson's authentication objection.

Under these circumstances, we conclude that the trial court did not abuse its discretion by determining that Cavinder's testimony was sufficient to support a finding that the audio recording was what it purported to be—a phone call made by Robinson to his mother while he was in jail. *See Knight v. State*, No. 13-22-00217-CR, 2023 WL 4662942, at *3 (Tex. App.—Corpus Christi–Edinburg July 20, 2023, pet. ref'd) (mem. op., not designated for publication); *Garcia v. State*, No. 01-21-00349-CR, 2022 WL 17981855, at *4 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. ref'd) (mem. op., not designated for publication); *Woodberry*, 2019 WL 2863867, at *7; *Martinez*, 2021 WL 804181, at *6. Because there was no evidence that the jailhouse call had been tampered with, the trial court could have also rejected Robinson's arguments as going to the weight of the evidence instead of to the threshold issue of admissibility. *See Kelly*, 529 S.W.3d at 513.

Even though we conclude that the trial court did not err by admitting the jailhouse call, we further note that Robinson cannot establish harm from its admission. This is because "admission of evidence does not constitute reversible error if the same facts are shown by other [cumulative] evidence which is not challenged." *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (quoting *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. [Panel Op.] 1978)). As a result, there is no harm "where the same evidence comes in elsewhere without objection." *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003); *see Josey v. State*, 97 S.W.3d 687, 698 (Tex. App.—Texarkana 2003, no pet.) ("If the same or similar evidence is

11

admitted without objection at another point during the trial, improper admission of the evidence will not constitute reversible error.").

On the call, Govan explained that the offense carried a life sentence. Robinson said he did not know what made him do it and told Govan that he could not sleep. Govan responded by telling Robinson that it was because he killed an innocent man, to which he responded, "I know." Without objection, Cavinder also testified about the substance of the jailhouse call. Cavinder said Robinson told Govan he could not sleep after the incident and that Govan responded, "You killed an innocent man." According to Cavinder, Robinson said two different times, "I know, Mama. I know." Cavinder testified that Robinson said he had "messed up."[4] Because Robinson failed to object to Cavinder's testimony, Robinson's alleged error must be deemed harmless. *See Josey*, 97 S.W.3d at 698.[5]

We conclude that Robinson cannot show that the trial court abused its discretion by admitting the jailhouse call over his authentication objection and that, even had there been any error, Robinson would be unable to show harm. As a result, we overrule Robinson's last point of error.

---

[4]After that evidence was admitted, Robinson later renewed his authentication objection, adding additional grounds. We do not consider those additional grounds since the exhibit had already been admitted, rendering Robinson's new arguments untimely. *See* TEX. R. APP. P. 33.1.

[5]To the extent that Robinson's brief can be read to argue that the trial court erred by admitting the jailhouse call because it was hearsay, we find the issue unpreserved since Robinson did not lodge a hearsay objection to the evidence at trial. *See* TEX. R. APP. P. 33.1.

### III.   Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:     September 9, 2024
Date Decided:       October 7, 2024

Do Not Publish