LEE GABRIEL, JUSTICE
Appellant Damian Merrick appeals from his convictions for one count of sexual assault of a child under seventeen by oral contact and for three counts of delivery of marijuana to a child under eighteen. See Tex. Health & Safety Code Ann. § 481.122 (West 2017) ; Tex. Penal Code Ann. § 22.011 (West Supp. 2017). He argues that the evidence was insufficient for a reasonable jury to find that the substance delivered was marijuana and that he was unconstitutionally denied the right to present a defense to the sexual-assault allegations. Because we find that the evidence was sufficient, that his constitutional and statutory claims were waived or forfeited, and that no reversible error occurred, we affirm the trial court's judgment.
I. BACKGROUND
A. FACTS LEADING TO INDICTMENTS
Appellant was an involved owner of a volleyball club. Elaine[1] joined one of the teams for Appellant's club in December 2014 when she was sixteen. Elaine became good friends with her teammate Holly, Appellant's daughter, and began spending a lot of time at Appellant's house. Elaine contended that Appellant allowed her and Holly to smoke marijuana and drink alcohol, which he provided.
In late February 2015, Elaine's team traveled to a volleyball tournament in Denver, Colorado. Appellant drove Elaine and her teammates Elizabeth, Isabell, and Holly to the tournament. During the ride, Appellant, Elaine, Elizabeth, and Holly smoked marijuana that Appellant provided. Once they arrived in Denver, another teammate's parent saw Appellant in a hot tub with Elaine, Elizabeth, and Holly, passing a vodka bottle to Elaine. After the tournament ended the next day, Appellant stopped at a marijuana dispensary in Colorado on the drive back to Texas and bought edible marijuana. Elaine and Appellant ate some of the marijuana that Appellant bought.
*362 Based on the hot-tub incident, the team broke up. Elaine's parents told her not to see Appellant or Holly anymore. But Appellant helped to get Elaine a job refereeing volleyball games. Appellant would provide marijuana that he and Elaine would routinely smoke before and after she would referee. Appellant and Elaine's relationship quickly became sexual, including Appellant allegedly digitally penetrating Elaine's sexual organ and placing his mouth on her sexual organ.[2] Elaine lied to her parents when she would see Appellant and would leave her cell phone in her car so they could not track her location.
On March 29, 2015, Elaine asked her friend Christy if she could bring Appellant to Christy's house if Appellant brought marijuana. Christy's family was out of town, and she was at home with her friend Mary. Christy agreed, and Appellant brought a "bag full" of both edible and smokable marijuana. Christy, Mary, Elaine, and Appellant ate and smoked the marijuana.
On April 3, 2015, the police received a report that Appellant had provided marijuana to "three teenage girls." Apparently, Christy told her parents about the March 29 incident who then contacted the police. Appellant's wife made him leave their home once the police investigation began. Appellant texted Elaine on April 6 and asked her to go with him to a hotel room, which she did. Once there, Appellant put his mouth on Elaine's sexual organ.
Eventually, the police investigation into the March 29 incident revealed Appellant's abuse of Elaine. On May 20, 2015, a nurse examiner performed a sexual-assault exam on Elaine. Elaine told the nurse examiner that Appellant had digitally penetrated her and orally contacted her sexual organ. The nurse examiner testified that during her exam of Elaine's genitalia there were "pink fleshy finger-like bumps" inside her vagina "in a cluster and in a circle," which were "indicative of condyloma, so genital warts." The nurse examiner explained that the condyloma virus is "[n]ot likely," but possibly, transmitted by digital penetration but may be transmitted by oral sex, penile penetration of the vagina, or penile penetration of the anus.
Appellant was indicted for the sexual assault of Elaine by digital penetration, alleged to have occurred on February 24, 2015, and for the April 6, 2015 sexual assault of Elaine by oral contact, both of which occurred when she was younger than seventeen. See Tex. Penal Code Ann. § 22.011(a)(2). He was also indicted in three counts for the March 29, 2015 delivery of marijuana to Mary, Elaine, and Christy, who were all younger than eighteen at the time. See Tex. Health & Safety Code Ann. § 481.122(a)(1).
B. TRIAL
Appellant attempted to impeach Elaine with an en masse proffer of 216 of Elaine's social-media posts, all of which were posted after her relationship with Appellant ended and continuing up until a few days before her trial testimony. The trial court excluded Appellant's proffered evidence. Appellant also tried to question Holly about the fact that Elaine had been dating an adult trainer at Appellant's volleyball club, Dan Neighbors,[3] and that Appellant had him fired in January or February of 2015 after Holly told Appellant about the relationship. The trial court sustained the *363 State's objection to the questions about Holly's knowledge of the relationship and that she told Appellant about it.[4] The trial court also disallowed Appellant's attempts to question Elaine about why she was initially unwilling to have a sexual-assault exam, to ask Elaine about her diagnosis of borderline-personality disorder, and to question the nurse examiner about Elaine's past sexual behavior.
The jury found Appellant not guilty of the digital penetration of Elaine but found him guilty of sexual assault by oral contact and of the three counts of delivery of marijuana to minors. After a punishment trial, the jury assessed Appellant's punishment at fifteen years' confinement for the sexual assault and at seven years' confinement for each of the delivery convictions.[5] The trial court rendered judgment on the jury's verdicts and ordered that the sentences run concurrently. See Tex. Code Crim. Proc. Ann. art. 42.08(a) (West Supp. 2017).
C. APPEAL
On appeal, Appellant asserts that the evidence was insufficient to support his convictions for delivery of marijuana because there was no evidence that the substance Appellant delivered to Christy, Mary, and Elaine was, in fact, marijuana. Appellant points out that Christy, Mary, and Elaine were not qualified as experts in the identification of marijuana and that edible marijuana and "substances mimicking marijuana" cannot be readily identified through lay testimony.
Appellant also argues that he was denied his constitutional and statutory rights to due process and confrontation because the trial court would not allow him to cross-examine Elaine about 112 of the 216 social-media posts he proffered at trial, about her initial refusal of a sexual-assault exam, and about her diagnosis of borderline-personality disorder. Appellant explains that this evidence would have impeached Elaine's credibility and furthered his defensive theory regarding her motive to fabricate her sexual-assault allegations. He also argues that the trial court abused its discretion and unconstitutionally violated his rights to due process and confrontation by not allowing him to question the nurse examiner about Elaine's past sexual conduct and by excluding his questions to Holly about her knowledge of Elaine's relationship with Neighbors.
II. SUFFICIENCY OF THE EVIDENCE: DELIVERY
In his second point on appeal, Appellant argues that because the "world of marijuana usage has evolved," Christy, Mary, and Elaine were not qualified either as expert or lay witnesses to testify that the substance they smoked and ate was marijuana and not a different, similar substance such as "K2, Spice[,] or some other synthetic substance mimicking marijuana." In our due-process review of the sufficiency of the evidence to support this element of Appellant's delivery conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found this challenged, essential element beyond a reasonable doubt. See *364 Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; Jenkins v. State , 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).
Elaine testified at trial that not only did she, Mary, and Christy eat the edible marijuana that Appellant provided, they also smoked the marijuana that he provided. Elaine also testified to other instances when she smoked marijuana that was provided by Appellant. In one instance, Christy was with Elaine and Appellant in a hotel room, where the three smoked marijuana and ingested mushrooms. And Elaine averred that she, Holly, and Appellant repeatedly smoked marijuana provided by Appellant. Indeed, Elaine stated that during the car trip to Colorado, Appellant provided marijuana that she, Holly, and Elizabeth smoked "[t]he whole way." Elizabeth confirmed that they smoked marijuana on the trip and that she saw Appellant buy edible marijuana from a Colorado dispensary.
Christy similarly testified that they all ate and smoked Appellant's marijuana and she admitted that the marijuana affected her "somewhat" and made her feel "chill." Christy had seen edible marijuana before the March 29 incident. She also stated that Mary seemed "a little bit ... different" after eating and smoking the marijuana, but that Elaine "was just used to [marijuana] from hanging out with [Appellant] previously." Christy testified that Appellant provided her edible marijuana while she was at school one day and that the edible was the same as the marijuana he provided on March 29. She also accompanied Appellant and Elaine to a "smoke shop near the school" where they tried different flavors of e-cigarettes in different pipes.
Mary testified that Appellant provided edible marijuana to her, Elaine, and Christy on March 29 and that he rolled a joint with "leafy" marijuana that they all smoked. She stated that she had never had edible marijuana before, which "was much stronger than ... smoking weed." In 2015, Mary was placed on community supervision after being arrested for driving while intoxicated and having marijuana, a marijuana grinder,[6] and a pipe in her car.
The jury also heard evidence of several internet searches done on Appellant's phone while the phone was in his possession: (1) "Can an adult be charged with a crime for smoking pot with a minor"; (2) "Can you smoke too much weed"; (3) "Can you overdose from marijuana"; and (4) "Smoking weed in a pipe." Further, when Appellant was arrested on May 7, 2015, officers found residue in his car that tested positive for marijuana.
This evidence was sufficient to sustain Appellant's conviction of delivery of marijuana to minors even though the marijuana was not introduced into evidence or tested for its chemical content. See Roberts v. State , 9 S.W.3d 460, 462-64 (Tex. App.-Austin 1999, no pet.). The testimony showed that the girls were aware Appellant had bought the marijuana from a marijuana dispensary in Colorado. They were all familiar with marijuana before March 29 and there was consistent testimony as to how they consumed it and how it affected them. See ids="11490592" index="9" url="https://cite.case.law/sw3d/9/460/#p462">id. at 463. Further, marijuana was found in Appellant's car when he was arrested, which lends support to the testimony that he delivered marijuana to Elaine, Christy, and Mary. See ids="11490592" index="10" url="https://cite.case.law/sw3d/9/460/#p462">id. The absence of expert testimony as to the chemical composition of the substance Appellant provided or of more detailed lay testimony does not render the evidence insufficient to support Appellant's conviction for delivery of marijuana to the three minors. See, e.g. , *365 Martinez v. State , No. 02-13-00236-CR, 2014 WL 3868215, at *6 (Tex. App.-Fort Worth Aug. 7, 2014, pet. ref'd) (mem. op., not designated for publication). We overrule point two.
III. EXCLUSION OF DEFENSIVE EVIDENCE: SEXUAL ASSAULT
In his remaining three points, Appellant argues that the trial court's exclusion of the social-media posts, exclusion of Elaine's psychiatric diagnosis, refusal to allow him to question Elaine about her initial refusal to get a sexual-assault exam, failure to allow him to question the nurse examiner about Elaine's past sexual behavior, and refusal to allow him to question Holly about Elaine's relationship with Neighbors resulted in the denial of his constitutional rights to present a complete defense and to confront the witnesses against him. He asserts that each of these points resulted in constitutional error that requires reversal because it cannot be determined beyond a reasonable doubt that the error did not contribute to his sexual-assault conviction or punishment. See Tex. R. App. P. 44.2(a). Regarding issues three and four, which raise the exclusion of Elaine's past sexual behavior and her relationship with Neighbors, Appellant also asserts that the trial court abused its discretion under the applicable evidentiary rules. Based on the following discussion, we overrule points one, three, and four.
A. CONSTITUTIONAL COMPLAINTS
Appellant contends that the excluded evidence violated his constitutional rights of due process and confrontation. We first note that Appellant did not separately brief the applicability of the Texas Constitution and the code of criminal procedure from his federal constitutional arguments or assert that either provides greater protections than does the United States Constitution. Thus, he has waived any argument regarding the import of the Texas Constitution and the code of criminal procedure to the exclusion of his proffered defensive evidence, and we will address his issues as he substantively briefed them-based on the protections provided by the United States Constitution. See Lilly v. State , 365 S.W.3d 321, 326 (Tex. Crim. App. 2012) ; Moreno v. State , No. 03-07-00713-CR, 2010 WL 2698510, at *3 (Tex. App.-Austin July 8, 2010, pet. ref'd) (mem. op., not designated for publication).
1. Social-Media Posts
Appellant asserts that he was denied important constitutional rights by the exclusion of 112 of Elaine's social-media posts. He argues that these posts established three defensive theories: (1) "her motive to lie about the sexual assault was to get herself out of trouble with her parents by falsely blaming all her negative conduct on Appellant, including the allegation that he assaulted her"; (2) Elaine was not embarrassed by her conduct as she stated at trial and actively sought relationships with older men; and (3) because some of the posts extolling her use of drugs and alcohol occurred shortly before her trial testimony, they would "impeach her capacity and competency to testify in a drug induced state."
During Appellant's counsel's cross-examination of Elaine, counsel requested a hearing outside the jury's presence and confirmed that the hearing related to rule 412, requiring the courtroom to be cleared of spectators. See Tex. R. Evid. 412(c).[7] Defense counsel then submitted 216 social-media posts "basically to rebut [Elaine's]
*366 statement that [Appellant] is to blame for everything" and, thereby, question her credibility as a witness. Appellant admits that all of the posts "occurred after she was no longer with Appellant."
At the hearing, the trial court and defense counsel had an extended discussion about the reasons Appellant sought admission of Elaine's 216 social-media posts-defense exhibits 3 through 218:
THE COURT: ... I've gone from Defense 3 to Defense 131. Most of these fall into three separate categories that I can see. 2016, this year, many of these concentrated around the holiday period of this year. 2013. Some of them are completely undated, but the majority of them have to do with drug use, and then some of them have to do with relationships.... There's one reference to this case, but it appears to be a reference where the witness was responding to something that someone had posted somewhere ... but she didn't appear to post it or to say anything about the case.
So do you have any particular theories of admissibility regarding the old stuff, the after case stuff, the drug use? I mean, none of it seems to be contextual. If it is, I haven't gotten to it yet.
[Defense counsel]: Okay. Here would be the big picture, is that-based upon what she testified to, that she's not a problem child, she has not been in trouble, and everything ... can be blamed on [Appellant]. And so we know that after 2015, [Appellant's] no longer in her life, but, yet, we know that she's smoking pot. She's doing all sorts of drugs. She posts it online. She puts it on public media. She puts it out there in the public domain that she's doing drugs.... She talked about it. [During cross-examination], [w]e talked about the pictures, about there being pills on her ... tongue, about it being the bong. So I'd like to show the jurors at least those pictures.
The other one, I have to look at them. There's 216. But basically to rebut her statement that [Appellant] is to blame for everything.
THE COURT: State's response?
[Prosecutor]: My response would be that I would think what [Elaine] meant by that was that she was introduced to all of this stuff at the age she was, when she was 16, and that has a lot to do with the fact that she's doing stuff now. But anything that she's doing now in her freshman year of college is completely irrelevant to what happened back with [Appellant] in 2015.
THE COURT: Right. Because this is-how she is now is not really in front of the jury.... It doesn't show that this offense did or did not occur. It doesn't matter clearly of credibility as to one statement that counsel is interpreting as every problem in my life has been caused by him: although, the jury doesn't know that these were-that she continues to use drugs. And so you're going to introduce that to them to show that she has other problems, but that's a bit of a circular argument, because it all happened afterwards. And so to say that she has problems anyway, after this supposedly happened to her, may or may not be true. I mean, it may be true that she would have had problems anyway. It may be true that if this happened to her, that's what caused her problems. So I think to introduce the fact that she continues to use drugs heavily, which is clearly shown beyond a doubt in these pictures, doesn't show her statement that her problems at this time with her parents and her problems with drug use had to do with [Appellant], because this is- *367 [Defense counsel]: That's actually my point. It is showing it doesn't have to do with [Appellant].
THE COURT: Well, it doesn't show that, because if he's the one who introduced her to heavy drug use, as she says-I mean, what she did afterwards doesn't mean that she did this-if she did this before, I would say, yes, clearly he did not get her involved in drugs. She chose to do that, and then he came into her life. But after the, you know, alleged incidents that she's describing where he brought her drugs and he fed her drugs and he bought her Red Bulls and all this stuff to say that what she did in 2016 has nothing to do with what happened in 2015, I don't think you can say that. It's not-if you say, well, if you had something bad happen to you, then everything else in your life doesn't have anything to do with that.
[Defense counsel]: Okay. How about this? It gets-let me try to articulate it better.
....
... First of all, she came in here and said something to the effect of how embarrassed she was by all of this.... Yet this is a woman who gets on social media and is clearly not embarrassed about sexual contact-conduct, talking about anal sex, whatever, all that stuff that she tweets out even as of two or three days ago. Tweets now how she's so high, she's so messed up, et cetera. So this goes to her credibility today as she testifies. We're not talking about whether or not she was doing sex and having sex back in 2015 or even doing drugs back in 2015 in regards to that. She says, "I'm so embarrassed." She comes out here crying and doesn't even want to talk about this. But, yet, this is a person who basically puts press releases out and says this is who I am. That's clearly not a person that is embarrassed. So that goes to her credibility.
The second thing I'd like to talk with her about is she said she didn't have any problems with her parents, the only problem she had was with [Appellant]. I'd like to know how many of those photos her parents know about, how many of those sites her parents know about, to rebut her belief that [Appellant] is the core of all her problems.
THE COURT: And, again to say something that happened to her in 2015 has nothing to do with what she's doing in 2016, you just can't make that argument. I mean, you can't know. People are too complex. For her to say, "I have a bad relationship with my parents in 2016," doesn't prove-even if it's true, it doesn't prove that it wasn't caused by what happened to her in 2015.
[Defense counsel]: Agreed. My point is not ... the ultimate what is the real reason. My point is, when she makes a statement, that I get to-that is global, that I get to rebut that statement to show her credibility to the jury today.
....
THE COURT: Well, and her global statement, of course, there's the core elements of the offense, and then there's her credibility, and then there's statements that she made that are very at the edges of whether-you know, huge statements about teenagers and whether they get along with their parents. I'm not sure how that relates to her, the core of her credibility, or the allegations in this case.
And certainly sexual conduct is right out under Rule 412. Has nothing to do ... with anything. And Rule 412 absolutely prohibits that. So I don't see anything that ... would come in under 412 in the sexual-themed exhibits in Defense Exhibit 3 through 218.
*368 I don't think the drug use-it's certainly-it has some de minimus probative value to go to disprove a global statement that doesn't really have anything to do with this case, but the prejudicial effect is greatly outweighed. It's really acts of specific misconduct that are specifically prohibited by-under impeachment offered under a different theory.
....
[Defense counsel]: Okay. I understand that.
Now do you want me to-for purposes of appeal, because there's-
THE COURT: I'm going to put these in the record and seal them.
[Defense counsel]: Okay. That's fine. But I need to make sure, for purposes of appeal, I've preserved the error and made a good offer of proof and tied them up with her....
....
... Let me offer in Defense Exhibit No. 3 through 218. This is my proffer, Judge, and these are what we would like to cross-examine the witness on.
[Prosecutor]: And we would object under Rule 412, 401, and 404 and 405.
THE COURT: And that objection is sustained. Defense 3 through 218 are going to be part of the record, but sealed because they do contain Rule 412 material that's mixed in amongst them, and they will remain part of the record.
At no point did counsel argue that the evidence should have been admitted based on due process or the confrontation clause. Indeed, the record is clear that the trial court considered Appellant's proffer under the rules of evidence, and defense counsel did not correct these unambiguous statements if they were mistaken. See Resendez v. State , 306 S.W.3d 308, 315-16 (Tex. Crim. App. 2009) (analyzing response of trial court and prosecutor in context to determine what each understood appellant's complaints to be); see also Tex. R. App. P. 33.1(a)(1)(A) (requiring for preservation that grounds for objection be clear from context or stated such that trial court is made aware of the complaint).
On appeal, however, Appellant argues that the constitutional guarantees of due process and confrontation required admission of 112 of the 218 proffered posts and asserts that the trial court's failure to admit those exhibits resulted in constitutional error. See Tex. R. App. P. 44.2(a). Appellant's trial objection did not clearly articulate confrontation or due process as grounds for the admission of the 218 social-media posts. See, e.g. , Lovill v. State , 319 S.W.3d 687, 691-92 (Tex. Crim. App. 2009). Therefore, he has failed to preserve these constitutional arguments for our review.[8] See Reyna v. State , 168 S.W.3d 173, 179-80 (Tex. Crim. App. 2005) ; see also Clark v. State , 365 S.W.3d 333, 339-40 (Tex. Crim. App. 2012) ; Leza v. State , 351 S.W.3d 344, 360-61 (Tex. Crim. App. 2011).
2. Unwillingness to Have Sexual-Assault Exam
Appellant asserts that the trial court committed constitutional error by not allowing him to cross-examine Elaine about her reasons for initially refusing to submit to a sexual-assault exam. He asserts that this evidence would have developed Elaine's "strong motives to keep her *369 bad behaviors hidden from her parents and to impeach the truthfulness of her testimony." At trial, Appellant tried to question Elaine about her reluctance:
[Defense counsel:] ... You told the detective repeatedly that you were scared of your parents finding out about a lot of different things?
[Elaine:] Right.
Q. You told the detective that you did not want to take the rape exam; is that correct?
A. Right.
Q. Because you didn't want your parents to find out things about you that they didn't know?
A. No. I didn't want to take it because I was scared of taking it.
Q. Why were you scared of taking it?
A. Who wants to get a rape test done? Nobody wants to go through that.
Q. You recall telling the detective that you did not want to take the exam for fear of what it would reveal to your parents.
[Prosecutor]: Your Honor, objection. Rule 412.
THE COURT: Sustained.
[Defense counsel]: I can't go into that?
THE COURT: Approach.
(At the bench, on the record:)
THE COURT: How does that not implicate her prior sexual-
[Prosecutor]: That's true.
[Defense counsel]: How can she still lie about it when she says, "I don't want them to know I'm not a virgin"? So she's allowed to lie about it, and I'm not allowed to cross-examine her?
THE COURT: I don't understand what you're saying.
[Defense counsel]: "That's not why I didn't want to take the rape exam. I didn't take the rape exam because I didn't want to."
THE COURT: You can't go into anything that has to do with her prior sexual history. I mean, the law is very clear.
[Defense counsel]: But she's allowed to lie?
[Prosecutor]: She's not lying.
[Defense counsel]: She's opened the door in this incident.
[Prosecutor]: No, she hasn't.
THE COURT: You can't ask her the question, "You didn't want to take it because it would show you're not a virgin," because that's a clear violation of Rule 412.
....
[Defense counsel]: Note my objection to the Court's ruling.
Again, Appellant did not raise his constitutional rights to confrontation or due process when arguing in response to the State's objection that this line of questioning was admissible. The trial court considered Appellant's proffer under rule 412, not the constitution; thus, Appellant has not preserved his constitutional complaint for our review.[9] See Reyna , 168 S.W.3d at 179-80 ; see also Clark , 365 S.W.3d at 340 ("[T]he trial court should know when it is being asked to make a constitutional ruling because constitutional error is subject to a much stricter harm analysis on appeal.").
*370 3. Psychiatric Diagnosis
Appellant asserts that his constitutional rights to due process and confrontation were violated by the trial court's refusal to allow admission of evidence that Elaine had been diagnosed with borderline-personality disorder, which "impermissibly limit[ed] Appellant's right to confront the foundational accuser." As with the social-media posts and Elaine's reluctance to submit to a sexual-assault exam, Appellant did not raise a constitutional objection in the trial court and argued only that it went to Elaine's credibility:
[Defense counsel]: I have two other matters that I have. Since we have the jurors gone, I might as well go. And one of them, ... [is] about all her counseling records and her counseling ....
....
I'd just like to go into her parents sent her to the treatment facility and that she was ultimately kicked out of it, out of Malibu.
THE COURT: For drug treatment?
[Defense counsel]: Yes.
THE COURT: It didn't have to do with this case?
[Defense counsel]: It kind of does in a sense. I mean, it talked about post-traumatic stress disorder as well as borderline personality disorder, several different diagnoses that I think that I'd like to talk to her about, get in front of the jury.
THE COURT: Okay. State's response?
[Prosecutor]: I can see how her being sent to rehab as a result of this would be relevant, but any further questions on what happened, what was-when she was there, any bad acts that she committed while she was there, any reasons for being kicked out, I think that would be more prejudicial than probative and would just go to attack her credibility, and I don't think it's proper.
THE COURT: It's also specific instances of conduct, so-which cannot be gone into. And the only thing that you can really get into is-she hasn't denied that she's been to rehab. She hasn't been asked about being in drug rehab. If you want to ask her, "Did you go to a treatment facility where you were treated for-you know, in part for this offense," yes,-
[Defense counsel]: Okay.
THE COURT: -then I'll allow you to do [sic] into that, but-
[Defense counsel]: What about going into her diagnosis?
THE COURT: What would be the relevance of her diagnosis?
[Defense counsel]: Her borderline personality disorder ? Going to her credibility. I think the jurors can make a decision about what that does or doesn't.
THE COURT: What does it mean to you?
[Defense counsel]: What it means to me is that she's a mess, that she is a mental health-she has mental health problems-
....
THE COURT: [Borderline-personality disorder ] does not have to do with credibility, necessarily. It has to do with someone's emotional dysregulation. So that's-I'm not sure how-what that has to do with credibility. I mean someone's not more likely to lie. Then the fact that they have a mental health diagnosis, that's not impeachment....
[Defense counsel]: No, I understand....
Well, I believe that it is a relevant consideration for the jurors in assessing her testimony, period. If they decide to use it for credibility, for understanding *371 why she acts the way she does or why she would have acted-why she would lie about this or not lie about this, that's up to them to decide how to use that. I mean, it is a fact.
THE COURT: It may be a fact, but without some kind of guidance as to how that impacts her, I'm not willing to put that in front of the jury....
[Defense counsel]: Okay. But I could go into the fact that she went to this treatment facility and these were the dates that she was there and blah blah blah.
THE COURT: And that she was treated for post-traumatic stress, if you want to go into that, because it has some relationship, potentially, to this case. I don't think this case-this offense ... could cause borderline personality issue.
[Defense counsel]: Well, exactly. That's my point. Actually, yes, I agree with that ....
... But it's something for the jurors to consider, is all I'm saying.
THE COURT: Well, if you hand them a piece of information to consider without any information about what it means, then I think it's more harmful than helpful to the jury, without expert testimony to interpret it or some kind of information.
Appellant's credibility arguments did not preserve his constitutional complaints for our review. See Reyna , 168 S.W.3d at 179-80 ; Perry v. State , 236 S.W.3d 859, 864 (Tex. App.-Texarkana 2007, no pet.).
4. Elaine's Past Sexual Behavior
Appellant argues that his right to present a defense was unconstitutionally infringed by the trial court's exclusion of evidence of the number of Elaine's prior sexual partners and by the fact that she previously had anal sex, which would have rebutted the State's theory that Elaine contracted genital warts through sexual contact with Appellant.
As recounted earlier, the nurse examiner testified on direct examination by the State that it was not likely that the condyloma virus would be transmitted by digital penetration but could be transmitted by oral sex, penile penetration of the vagina, or penile penetration of the anus. After she reiterated on cross-examination that the condyloma virus is "more commonly transferred by genital-to-genital contact, genital-to-anal contact, or by the mouth" and affirmed that it could not be determined when someone contracted the virus, Appellant's counsel requested a hearing outside the jury's presence. The trial court asked counsel, "And is this going to be pursuant to 412?" Counsel stated, "Yes."
During the hearing held under rule 412, the nurse examiner stated that Elaine had told her that she previously had unprotected vaginal intercourse and anal sex. But the nurse examiner answered "[n]o" when defense counsel asked if she was told that Elaine's sexual activity began when she was fourteen and if she knew that Elaine had had seven sexual partners by the time she was sixteen. The State objected to the proffer under the rules of evidence:
State objects, Your Honor. This falls, the State would argue, right within the rule. Via the nurse's testimony, the relevancy of that is not present because it could be a myriad of different factors with when it was obtained, how it was transferred, when it possibly could have been transferred, and we would argue, Judge, again, falls right in line with 412 and is not relevant or admissible.
The trial court then asked the nurse examiner questions before sustaining part of the State's evidentiary objection:
THE COURT: Let me ask you: As far as the genital warts, can you tell *372 anything about the source of the genital warts from the sexual history?
[Nurse]: No.
THE COURT: Is it possible that the genital warts was from a previous partner?
[Nurse]: Yes.
THE COURT: Is it possible that the genital warts were from what was reported to you as the incident in question?
[Nurse]: Yes.
THE COURT: Defense?
[Defense counsel]: 412(b), Judge, is what we would offer it under.
THE COURT: And what exactly did [Elaine] tell you about her sexual history?
[Nurse]: She told me that she had had sex a year ago with a 17-year-old. It was penile-vaginal, and she had-and she didn't use a condom.
And then, if-if you don't mind, I will tell you kind of how I ask things, because children don't always give-or people don't always give the information. I have to kind of lead it out of them sometimes, because they don't want to. It's embarrassing.
So she told me-she gave me that information, and I say-because, remember, I've just met her. And then I say, "Okay. I've got to ask you a really crazy question, but it's really important that I know. Have you ever had anal sex?" And then-
THE COURT: Does anal sex have to do with the warts that we're talking about?
[Nurse]: It has to do with what-how I'm going to diagnose and treat it. Sometimes it can be-yes, it can be-
THE COURT: In this case, did the warts we're talking about have anything to do with anal sex? We're focusing on just the warts.
[Nurse]: No.
THE COURT: And how the warts could become to have been where they were on her?
[Nurse]: Yes, it could have.
THE COURT: How could it have?
[Nurse]: Any transmission. I mean, I didn't see any anal warts.
THE COURT: Okay. We're talking about genital warts, so this-
[Nurse]: Right.
THE COURT: The fact that-was there anything that indicated that she had a sexually transmitted disease that had to do with the anal contact?
[Nurse]: No.
THE COURT: Okay.
[Nurse]: But I asked that.
THE COURT: Okay.
[Nurse]: So that's how I asked. I don't know if it was from that 17-year-old or someone else.
THE COURT: But it doesn't have anything to do with the warts.
[Nurse]: Correct.
THE COURT: Okay. What I'm going to let you do is about what she said, because that is a possible-under 412, that's a possible explanation for how she has these warts. It's an alternative, and it's clearly admissible under 412. But I'm not going to allow you to ask about seven sexual partners or anything other than what she said to the nurse examiner.
[Defense counsel]: Okay.
[Prosecutor]: ... Just for clarification, what exactly is that? What's the question?
[Defense counsel]: What she told the nurse examiner.
*373 THE COURT: What she told the nurse examiner about her prior sexual history regarding genital-the genital contact, not the anal contact.
[Defense counsel]: Okay.
THE COURT: All right?
[Defense counsel]: I understood that.
THE COURT: So that's all we're talking about.
[Defense counsel]: I understood that.
THE COURT: How she could have come to have these warts outside of her contact with [Appellant], allegedly. All right?
[Defense counsel]: Yes.
THE COURT: State?
[Prosecutor]: Well, she could have ... obtained the warts through her contact.
THE COURT: Absolutely she could have, but 412 says that anything that's necessary to rebut or explain the scientific or medical evidence offered by the prosecutor. So you've got some medical evidence of a sexually transmitted disease. They get to rebut that, that he gave her the sexually transmitted disease, because she said there's someone else that she had sex with, and that's a potential source of infection.
....
... All right. That's it. That's all you're going to be able to ask.
[Defense counsel]: I think you perfectly articulated it.
....
... Thank you, Judge.
Appellant did not raise any argument in the trial court arising under the constitution to justify admission of the excluded evidence and, therefore, did not preserve that claim for our review. See Reyna , 168 S.W.3d at 179-80 ; Harper v. State , No. 02-15-00374-CR, 2016 WL 4045203, at *5 (Tex. App.-Fort Worth July 28, 2016, no pet.) (mem. op., not designated for publication). Further, Appellant did not object at all to the trial court's ruling allowing some of the proffered testimony-what Elaine told the nurse examiner about prior vaginal contact-and excluding other portions-what Elaine told the nurse examiner about prior anal sex and the number of her prior sexual partners. See Tex. R. App. P. 33.1(a). Appellant's failure to object to the ruling also forfeited any error arising from the partial exclusion. See Taylor v. State , No. 02-11-00037-CR, 2012 WL 662373, at *3 (Tex. App.-Fort Worth Mar. 1, 2012, pet. ref'd) (mem. op., not designated for publication); Sanchez v. State , No. 04-05-00766-CR, 2006 WL 3204900, at *2 (Tex. App.-San Antonio Nov. 8, 2006, no pet.) (mem. op., not designated for publication). See generally 43A George E. Dix & John M. Schmolesky, Texas Practice Series: Criminal Practice & Procedure § 53:153 (3d ed. 2011) (collecting and discussing cases regarding defendant's abandonment of earlier assertion).
5. Elaine's Relationship with Neighbors
Appellant contends that the trial court violated his right to due process and his right to confrontation by sustaining the State's objection to Holly's testimony about Elaine's relationship with Neighbors and why he was fired. He asserts that this evidence "further[ed] his defensive theory of motive" and allowed him to confront Elaine "with the reasons her testimony was unreliable."
During Appellant's cross-examination of Elaine, she testified that she and Holly stopped being friends because Elaine was "hanging out" with Appellant and denied that it was caused by Holly telling Appellant about her relationship with Neighbors.
*374 She admitted that she had told Holly about her relationship with the trainer and that she knew Appellant had "intervened" in that relationship; but she denied that she knew Appellant's intervention was caused by Holly. The trial court sustained the State's objection under rule 412 to Appellant's attempted cross-examination delving into Elaine's relationship with Neighbors. During the presentation of Appellant's case, defense counsel called Holly as a witness and attempted to question her about whether she told Appellant about Elaine and Neighbors:
[Defense counsel:] ... Was there a time period that you told on [Elaine] about a guy named [Neighbors]?
[Holly:] Yes, ma'am.
Q. Who did-
[Prosecutor]: Objection. Hearsay.
THE COURT: Sustained.
Q. (BY [defense counsel]:) Who did you tell-who did you-
[Prosecutor]: Objection. Hearsay.
THE COURT: Nothing about what somebody says.
[Defense counsel]: Well, it's her.
THE COURT: Doesn't matter. It's an out-of-court statement. It's hearsay.
Q. (BY [defense counsel]:) Were you concerned about [Elaine] and [Neighbors]?
[Prosecutor]: Objection. 412. And hearsay.
THE COURT: Counsel approach.
(At the bench, on the record:)
[Defense counsel]: All I want to get into is this, Judge, is that she told her dad about [Elaine] dating [Neighbors]. I'm not talking about sexual behavior. I'm talking about dating [Neighbors]. It goes to the motive for [Elaine] not to like [Holly] and for [Elaine] not to like [Appellant], because [Appellant] ultimately gets the guy fired from the club, the place they were working out. So I'm not talking about sexual behavior.
THE COURT: What you're saying is complete and utter hearsay.
[Prosecutor]: You should have asked [Elaine] about all that.
[Defense counsel]: I did.
[Prosecutor]: Which is improper under 412. Which is why we kept it out then. You can't sneak it in through [Holly].
[Defense counsel]: I understand, but all I'm going for is the motive.
THE COURT: There may be something to that, but you can't go into hearsay, what she said, what somebody told her. I mean, if she knows not based on hearsay ... [.]
[Defense counsel]: Well, she left it in the way she sees. I'm not going to know what she saw or not. She knows there's a relationship between [Elaine] and [Neighbors].... And she goes and tells her dad, and her dad goes and gets him fired, because he's a trainer at the club. That's all I want to go into. And [Elaine] said, yeah, he got him fired. [Elaine] testified-
THE COURT: She testified to it?
[Prosecutor]: No, we didn't talk about firing or anything.
....
[Defense counsel]: It goes to the bias or motive.
[Prosecutor]: She's not the proper witness.
....
[Defense counsel]: What I'm going into is the breakup of these two friends, one of the things that broke them up, why they do not like each other. And one of the things that is huge in that breakup is that she basically narcs her out and gets her boyfriend fired.
*375 THE COURT: She doesn't get her boyfriend fired, though, without-I mean, what you're basing this on has got to be hearsay. She didn't do anything. She just heard something and said something. So that's all 100 percent hearsay. She saw what?
[Defense counsel]: She saw that [Elaine] was going out with a[n] older guy, [Neighbors]. We're going to go into that. She gets her boyfriend and her to get broken up. The guy gets fired.
THE COURT: I would say that's 100 percent hearsay unless she was there when he got fired.
[Defense counsel]: Well, we don't need to go into fired. What she knows is that she saw-
[Prosecutor]: But that would be speculation.
THE COURT: She saw what?
[Defense counsel]: [Elaine] going out with an older guy, and she went and told on her to her dad.
THE COURT: That's hearsay. Hearsay. It's still hearsay.
....
... I mean, and without the hearsay, it's not relevant. You can't back door the hearsay. You know, it's not admissible, even if it is relevant.
[Defense counsel]: So that-is that a good offer of proof?
THE COURT: Yes.
....
... I'm sustaining the objection, State's objection.
Thus, the record shows that the trial court understood Appellant's admission arguments to fall under the rules of evidence. At no time was there a discussion of Appellant's constitutional rights to due process or confrontation. Appellant did not preserve his constitutional arguments arising from this exclusion for our review. See Clark , 365 S.W.3d at 340 ; Reyna , 168 S.W.3d at 179-80 ; Reynolds v. State , 371 S.W.3d 511, 519 n.2 (Tex. App.-Houston [1st Dist.] 2012, pet. ref'd).
B. COMPLAINTS BASED ON THE RULES OF EVIDENCE
Appellant additionally asserts that the trial court's exclusion of Elaine's past sexual behavior and of her relationship with Neighbors were abuses of its discretion under the applicable rules of evidence. Appellant is correct that we review the exclusion of proffered evidence for an abuse of discretion, which is shown only if the ruling was so clearly wrong as to fall outside the zone within which reasonable people might disagree. See Henley v. State , 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016) (quoting Taylor v. State , 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) ).
1. Elaine's Past Sexual Behavior
Appellant relies on rule 412(b) and asserts that it was an abuse of the trial court's discretion to exclude "the totality of prior sexual partners [Elaine] had" and the fact that Elaine previously had anal sex. See Tex. R. Evid. 412(b)(2)(A) (allowing admission of specific instances of sexual-assault victim's past sexual behavior to rebut the State's medical evidence). As we noted in our constitutional discussion, Appellant did not object to the exclusion of the evidence, which forfeits any error.[10] See Dix & Schmolesky, supra , at § 53:153.
2. Elaine's Relationship with Neighbors
Appellant contends that the trial court abused its discretion by ruling that *376 Holly's testimony regarding Elaine's relationship with Neighbors and why Neighbors was fired was inadmissible hearsay. He argues that Holly's excluded testimony-that she told Appellant about the relationship and that Neighbors was fired-was not hearsay because "it was [Holly's] statements herself, her personal observations [of Elaine dating Neighbors], and not offered for the truth of the matter asserted, but to prove motive," i.e., "why [Elaine] was angry at Appellant and [Holly] prior to alleging the sexual assault."
First, Appellant did not object to the exclusion of evidence that Neighbors was fired from his job at Appellant's volleyball club, conceding that "we don't need to go into fired." See id. Second, the evidence that Elaine was seeing Neighbors, that Appellant stopped her from doing so, and that Elaine assumed Appellant was involved in getting Neighbors fired was admitted before the jury during Appellant's cross-examination of Elaine:
Q. And [Neighbors]-did you ever talk to [Holly] about [Neighbors]?
A. Yes.
Q. Did she ever tell you that she told on you about [Neighbors]?
A. No.
Q. Did you ever know that [Appellant] intervened in your relationship with [Neighbors]?
A. Yes.
Q. But you did not know that it had anything to do with [Holly]?
A. Right.
Q. Well, tell me what happened there.
A. I just did.
Q. Okay. That [Appellant] intervened in your relationship with [Neighbors]?
A. I'm saying that the reason me and [Holly] stopped being friends was because of [Appellant] and me hanging out.
....
... I had no idea [Holly] knew any-said anything about [Neighbors], so that's not the reason we stopped being friends.
Q. What about you and [Appellant]?
A. What about it?
Q. Did he stop you from hanging out with a guy named [Neighbors]?
A. Yeah. I figured he was the one who told on him and got him fired.
Because the substance of the evidence Appellant sought to admit through Holly was admitted through Elaine, Appellant cannot show harm in that the exclusion of Holly's testimony-categorized as nonconstitutional error-did not affect his substantial rights. See Tex. R. App. P. 44.2(b) ; Womble v. State , 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981) ; Owens v. State , No. 05-12-01201-CR, 2014 WL 2568483, at *8 (Tex. App.-Dallas June 9, 2014, no pet.) (mem. op., not designated for publication).
IV. CONCLUSION
We conclude that the evidence was sufficient to show that the substance Appellant delivered to the three minors was, in fact, marijuana. Regarding Appellant's sexual-assault conviction, we conclude that he failed to preserve for our review his arguments that the challenged, excluded evidence violated his constitutional rights to due process and confrontation. Similarly, he failed to object to the trial court's ruling excluding only part of his proffered evidence to rebut the State's medical evidence. And he cannot show the requisite harm arising from the exclusion of Holly's testimony about Elaine's relationship with Neighbors because similar evidence was admitted during Appellant's cross-examination *377 of Elaine. Thus, we overrule Appellant's points and affirm the trial court's judgments. See Tex. R. App. P. 43.2(a).

We use aliases to refer to all minors and their family members. See Tex. R. App. P. 9.8 cmt., 9.10; 2d Tex. App. (Fort Worth) Loc. R. 7.

Because Appellant does not challenge the sufficiency of the evidence to support his conviction for sexual assault by oral contact, we need not belabor the facts of that offense or the sexual nature of his and Elaine's relationship.

Again, this is an alias.

Appellant's counsel agreed that "we don't need to go into fired."

During the trial on punishment but before the trial court read the punishment charge to the jury, a juror became disabled; however, the remaining eleven rendered the punishment verdict over Appellant's objection. See Tex. Code Crim. Proc. Ann. art. 36.29(a) (West Supp. 2017). Appellant does not argue on appeal that this constituted reversible error.

A grinder is used to cut marijuana buds to prepare them to be rolled into cigarettes. See, e.g. , Kelly v. State , 529 S.W.3d 504, 515 (Tex. App.-Texarkana 2017, no pet.).

Rule 412 generally renders evidence of a sexual-assault victim's past sexual behavior inadmissible but provides exceptions in specified instances. Tex. R. Evid. 412(a)-(b).

Other than a bare citation to rules 404(b) and 613(b) in a footnote in his brief, Appellant fails to clearly argue that the trial court abused its discretion under the rules of evidence by excluding the social-media posts. See generally Tex. R. App. P. 38.1(f), (i) (including subsidiary questions in issues presented if "fairly included" and requiring "clear and concise argument" to appropriately brief an issue).

Appellant argues on appeal that this exclusion was constitutional error but does not assert that the trial court abused its discretion by misapplying the rules of evidence. Indeed, Appellant asserts that the evidence should have been admitted "regardless of Rule 412."

Even if error were preserved, the nurse examiner testified that she had no knowledge of the number of Elaine's prior sexual partners, and indicators of the condyloma virus were found in Elaine's vagina, not her anus.