

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00177-CR

_____

IKEEM ELIJAJUAN SHAW, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 58,982-B

_____

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Ikeem Elijajuan Shaw appeals from his convictions for one count of aggravated assault with a deadly weapon and for two counts of deadly conduct. *See* Tex. Penal Code Ann. §§ 22.02(a)(2), 22.05(b)(1). In a single issue, Shaw argues that the trial court abused its discretion by admitting over his objection video-surveillance footage of the events giving rise to his conviction because the video had not been properly authenticated. *See* Tex. R. Evid. 901(a). Because the trial court did not abuse its discretion by admitting the video, we will affirm the trial court's judgments.

## I. Background

In May 2017, Entonyo Jones had recently been released from prison. During Jones's incarceration, he learned that Shaw had been having an affair with Jones's girlfriend, Kisaya Manuel-Greer. On May 19, 2017, Jones contacted Shaw through Facebook Messenger to confront him about the alleged affair, and after the conversation became heated, Jones and Shaw agreed to meet on Red Fox Road, a residential street in Wichita Falls.[1]

Jones, along with Manuel-Greer and their small child, drove to Red Fox Road in Jones's Dodge Challenger. Jones's brother, Montrail Sanders, lived on Red Fox Road. When Jones arrived on Red Fox Road, he briefly parked in front of Sanders's

---

[1]This wasn't Jones and Shaw's first meeting on Red Fox Road. Before Jones's prison stint, he and Shaw had a disagreement and had met there to have "a man-to-man talk."

house and told Sanders, who was standing in the doorway of his home, that he was "fixing to fight." Jones then backed up his car and parked two houses down from Sanders's house.

According to Jones, Shaw arrived "[l]ike a thief in the night." Both men got out of their cars. Shaw started shooting at Jones, and Jones threw himself back into his car. But Shaw kept shooting at Jones, and multiple shots hit Jones.

Sanders testified that by this time, he had started throwing objects at the shooter to distract him and to stop him from shooting. The shooter then fired at Sanders. According to Sanders, Manuel-Greer repeatedly screamed "stop" during the shooting while using a name that sounded like "Akeem" or "Ikeem."

Manuel-Greer drove Jones to the hospital in his car. Jones's treating physician asked Jones who had shot him, and according to the physician, Jones responded, "Akeem Shaw, Shawl."

Wichita Falls Police Department detectives Marisa Cervantes and John Laughlin were assigned to investigate the case. Both detectives went to the hospital that evening.[2] Detective Cervantes interviewed Manuel-Greer and Sanders among others but was unable to interview Jones because he was receiving medical treatment. Detective Laughlin processed Jones's Dodge Challenger for evidence and then went to the crime scene. He saw cartridge cases in the roadway near 1608 Red Fox Road.

---

[2]The shooting occurred around 7:00 p.m.

3

Officers at the scene informed Detective Laughlin that the house at 1609 Red Fox Road had surveillance cameras attached to it. Detective Laughlin called in another detective, Jason Jones, to talk with the homeowner about getting the video footage from those cameras.

Meanwhile, Detective Cervantes arrived at the crime scene and was notified that one of the cameras had recorded the shooting. She went with her supervisor and Detective Jones to meet with the homeowner about the video. Detective Cervantes watched the video recording "from the time that we were called, moments before then, and then until the incident happened." She concluded that the video footage corroborated the statements she had taken. Specifically, she saw a car in the video (a white SUV) that matched the description of the suspect's car. The video was downloaded off of the homeowner's digital video recorder that was connected to the camera.

Five days after the shooting, Detective Cervantes and Detective Laughlin interviewed Jones in the hospital. Jones identified Shaw in a photographic lineup.

The State charged Shaw in a single indictment with one count of aggravated assault with a deadly weapon against Jones (Count One) and with three counts of deadly conduct by knowingly discharging a firearm at Sanders (Count Two), Manuel-Greer (Count Three), and Jones and Manuel-Greer's child[3] (Count Four), with each

---

[3]According to Detective Cervantes, the child was in the back seat of Jones's car during the shooting.

count enhanced by the same prior felony conviction. Tex. Penal Code Ann. §§ 12.42(a), (b), 22.02(a)(2), (b), 22.05(b)(1), (e). Shaw pleaded not guilty to each count, and the case was tried to a jury.

During trial, Detective Cervantes and Detective Laughlin testified about their investigations, including Jones's identifying Shaw in a photographic line up and the video-surveillance footage. Regarding the surveillance footage, Detective Cervantes agreed that the video showed "unique characteristics" from the scene—the video showed the street outside the house and a tree in the homeowner's front yard, which she had seen while walking up to the house. Detective Cervantes testified that the video's date stamp matched the date of the shooting but that the time stamp was "off a little bit," which was "not uncommon due to . . . Daylight Savings Time and stuff like that."

Detective Laughlin had also viewed the video. Like Detective Cervantes, Detective Laughlin recognized unique characteristics in the homeowner's front yard and beyond that matched his observations at the scene:

> in the front yard of 1609, there's a bush or a tree that's kind of off to one side that you can see on the camera angle that points into the street, as well as the houses across the street and the vehicles that were positioned in the driveway at the time that we were there and the time that the recording was made.

Detective Laughlin further testified that although the date stamp on the video was correct, the time stamp was off by more than an hour.

Both detectives also testified about the video's clarity and coloration. Detective Cervantes admitted that the video was not clear enough to identify facial features, articles of clothing, or the make of the vehicles. Detective Laughlin similarly admitted that he was unable to determine from the video the make and model of the suspect's white SUV. But he could see the suspect getting out of the SUV, and the Dodge Challenger in the video was "obviously" a Dodge Challenger.

Regarding the video footage's coloration, both detectives admitted that it was discolored. Both detectives saw Jones's Dodge Challenger at the hospital the evening of the shooting. Detective Cervantes described the car's color as "bluish-green"; Detective Laughlin testified that the car was "kind of iridescent, sort of a black or bluish-green kind of a paint job" and agreed with the prosecutor that the car "had a weird color depending on how you looked at it." Both detectives agreed that not only did the video not accurately reflect the Dodge Challenger's color but that the video did not accurately reflect the color of the crime scene and its surroundings.

When Detective Cervantes was questioned by the State, she agreed that it was "common for videos to have [a] different tint or not be the exact color as in real life." She explained that "sometimes there's different settings, especially when it is facing the sun. Is it out of the sun? Is it under a porch? So sometimes the colors aren't true depictions of what it actually looks like . . . ." Detective Laughlin similarly explained that

6

[t]here can be color discrepancies on video cameras from my training and experience of looking at lots and lots of crime scene videos. . . . [I]t just depends on the environment, how old the camera or equipment is and whether or not the user takes the time to adjust things like saturation, hue, contrast, brightness, all those things will impact what -- what the quality of the video you're looking at is.

Despite the video's coloration issues, neither detective doubted the video's authenticity. Detective Cervantes stated that the tint did not give her any reason to doubt the accuracy of the images depicted in the recording; that she could still discern unique shapes and sizes, including physical traits of individuals appearing in the recording; and that the recording would help the jury understand the events that had occurred during the shooting. Detective Laughlin agreed that the video would help the jury better understand the scene and what happened that day. He acknowledged that while there was a color discrepancy between the video and the actual colors at the scene, the color variation did not affect his opinion that the images on the video were accurate.

Jones testified regarding the events leading up to the shooting, the shooting itself, and his injuries and resulting hospitalization and surgeries. At trial, he identified Shaw as the shooter. Jones had previously watched the video and confirmed that it depicted what he had seen and experienced the day of the shooting and that "it looks like it had [not] been altered or changed in any way from what [he] remember[ed]." Jones stated that he recognized his car in the video. He did not recall the video

"having a different tint to it" and stated that his car—which he testified was teal green in color—was the same color in the video as "it is typically."

When the State offered the video into evidence, Shaw's defense counsel took Jones on voir dire. Jones maintained that the video's coloration was accurate but admitted that the images were somewhat blurry and that it was somewhat difficult to discern the facial features of the people in the video due to the video's low resolution. When defense counsel asked, "because the colors are messed up and you're not able to determine the identity of people on the video, it's not a true and accurate copy of the events . . . that occurred that day, are they?" Jones responded, "I don't know." Shaw's defense counsel then objected to the video's admission into evidence, arguing that

> [t]he State has failed to prove proper predicate. In fact, the only real testimony that we've had is that it's not a true and accurate copy. I'm sorry -- that the video does not accurately depict the events as they occurred, which would include the color. Uh, just like any other photograph, it's not an accurate copy -- or it's not an accurate video and, therefore, Judge, it should not be admitted.
>
> . . . .
>
> Uh, but in the larger matter, what we're talking about here is, again, the accuracy of the video. It's not enough to have someone watch the video. The video, itself, has to be accurate. And the video, itself, has to, in every respect -- You don't get to have a video that's only -- that only has 50 percent of the accuracy. It has to be 100 percent of the accuracy.
>
> And the testimony has been consistent throughout this case that both Detective Laughlin and Detective Cervantes viewed the video, and they both indicated that there are color discrepancies throughout the

video, not in isolated incidence of the vehicle, which is really more of an example, but the rest of the video as well. The accuracy of it absolutely goes to its admissibility.

The trial court overruled the objection, granted Shaw a running objection, and admitted the video into evidence. The State then played the video, which does not have audio, to the jury. The video shows Jones's car[4] and then a white SUV arriving at the scene. The shooter gets out of the white SUV, walks around the front of it, and approaches the driver's side of Jones's car. The shooter then appears to shoot Jones as he is getting out of the car. A woman[5] gets out of the passenger's side of Jones's car, runs around the back of the car, and gets into the driver's side as the shooter returns to the SUV and starts to drive away. The SUV quickly stops, and the shooter gets out, runs down the street, and shoots toward someone or something offscreen.[6] The shooter walks back toward Jones's car before walking back to the SUV, getting into the SUV, and driving away. Jones's car drives away shortly thereafter.

Jones's car appears purple in the video, and the surrounding neighborhood has a greenish tint. The video's date stamp is "05/19/2017," and the time stamp when Jones's car first appears is "08:50:10."

---

[4]As the video was played, Jones confirmed that the car depicted in the video was in fact his.

[5]Jones identified this woman as Manuel-Greer.

[6]According to Jones, the shooter was aiming at Sanders.

After the State played the video, the jury heard additional evidence from the State, including Jones's physician's testimony regarding Jones's identification of the shooter at the hospital and Sanders's testimony regarding Manuel-Greer's yelling at the shooter by name. After the parties rested and closed, the jury found Shaw guilty of Counts One, Two, and Three and found him not guilty of Count Four. Shaw pleaded true to the sentence-enhancement allegation as to each count, and after hearing punishment evidence and arguments, the jury assessed Shaw's punishment at 25 years' confinement for Count One, five years' confinement for Count Two, and two years' confinement for Count Three. The trial court sentenced him accordingly.[7]

Shaw has appealed. In his sole issue, Shaw challenges the trial court's admission of the video into evidence, arguing that the trial court abused its discretion by admitting the video and that the video's admission was harmful. *See* Tex. R. App. P. 44.2(b).

## II. Standard of Review

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *Merrick v. State*, 567 S.W.3d 359, 375 (Tex. App.—Fort Worth 2018, pet. ref'd). A trial court abuses its discretion if its decision falls outside the zone of reasonable disagreement. *Henley*, 493 S.W.3d at 83;

---

[7]The trial court signed an acquittal judgment on Count Four.

*see Merrick*, 567 S.W.3d at 375. We cannot reverse a trial court's decision unless we find that "the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Henley*, 493 S.W.3d at 83 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim App. 2008)).

### III. Applicable Law

To properly authenticate or identify an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. Tex. R. Evid. 901(a). Rule 901(a)'s admissibility threshold is liberal. *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). "Conclusive proof of authenticity before allowing admission of disputed evidence is not required." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim App. 2018). Rule 901 "merely requires some evidence sufficient to support a finding that [the] evidence in question is what the proponent claims." *Id.* (quoting *Reed v. State*, 811 S.W.2d 582, 587 (Tex. Crim. App. 1991)).

Rule 901 identifies numerous means of authentication. *See* Tex. R. Evid. 901(b). Regarding video recordings, testimony from a person who personally witnessed what is on a video is one means of authentication. *See* Tex. R. Evid. 901(b)(1); *Fowler*, 544 S.W.3d at 849; *Standmire v. State*, 475 S.W.3d 336, 344–45 (Tex. App.—Waco 2014, pet. ref'd). A video can also be authenticated by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Fowler*, 544 S.W.3d at 849 (quoting Tex. R. Evid.

901(b)(4)). "Video recordings without audio are treated as photographs and are properly authenticated when it can be proved that the images accurately represent the scene in question and are relevant to a disputed issue." *Id.* (citing *Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988)). In a jury trial, the trial court's role is to make a preliminary determination whether the proponent has supplied enough facts to allow the jury to reasonably conclude that the proffered evidence is authentic. *Butler*, 459 S.W.3d at 600; *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). After the trial court admits the evidence, the jury ultimately determines whether the item is indeed what its proponent claims. *Butler*, 459 S.W.3d at 600; *Tienda*, 358 S.W.3d at 638.

## IV. Analysis

Here, Shaw argues that the trial court abused its discretion by admitting a video that "both parties agreed had badly inaccurate coloration." Shaw complains that not only was the video's coloration distorted but that the video's time stamp was wrong, the homeowner was unavailable to testify about the recording, and there was no evidence regarding the type of recording equipment used, whether that equipment was properly set up, how the video was created, or whether the recording had been altered. Shaw thus asserts that the video was not a fair and accurate depiction of the shooting and that the trial court's finding that the video was authentic was thus outside the zone of reasonable disagreement.

12

To authenticate a video, a video's proponent is not required to present evidence from the equipment's owner[8] or evidence regarding how the video was recorded, the equipment that was used, or whether the equipment was working properly. *See Fowler*, 544 S.W.3d at 849–50; *Standmire*, 475 S.W.3d at 344–45; *see also Hudson v. State*, No. 14-16-00581-CR, 2017 WL 5472626, at *2–3 (Tex. App.— Houston [14th Dist.] Nov. 14, 2017, pet. ref'd) (mem. op., not designated for publication). Instead, a video can be authenticated through the testimony of a witness who personally witnessed the events depicted in the video. *See, e.g.*, *Standmire*, 475 S.W.3d at 344–45 ("[I]f the sponsoring witness was present when the photographs or video were taken or has personal knowledge of what the photographs or video depict, it is unnecessary for the sponsoring witness to also testify regarding the reliability of the system."). A video can also be authenticated through circumstantial evidence regarding "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Fowler*, 544 S.W.3d at 849–50 (quoting Rule 901(b)(4) and concluding that the officer's testimony regarding his in-person request of the store manager to pull the surveillance video on a certain date at a certain time, the video's time and date stamp matching the time and date of the offense, and the video's containing the defendant's image at the date and time of the offense was sufficient circumstantial

---

[8]The State could not have authenticated the video at trial through the homeowner's testimony because the homeowner died before trial.

13

evidence to authenticate the video; testimony from the store employee responsible for maintaining surveillance system was not required); *see Verdine v. State*, No. 01-18-00884-CR, 2020 WL 1584468, at *8–9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2020, pet. ref'd) (mem. op., not designated for publication).

Here, Jones took part in and personally witnessed the events depicted in the video, and he confirmed that the video accurately depicted what he had seen and experienced the day of the shooting. Jones was thus a person with knowledge, and his testimony authenticated the video. *See* Tex. R. Evid. 901(b)(1); *Standmire*, 475 S.W.3d at 344–45. Detective Cervantes testified about going to the crime scene, talking to the homeowner whose surveillance camera had recorded the shooting, and viewing the video, which corroborated the witness statements she had taken. She further testified that the date stamp on the video matched the date of the crime and that the video accurately reflected the yard and street outside the homeowner's home. Detective Laughlin, who had also been to the crime scene, similarly testified that he had viewed the video, which had the correct date stamp and accurately depicted the home's surroundings. The detectives' testimony provided additional support for concluding that the video was what the State claimed it was. *See* Tex. R. Evid. 901(b)(4); *Fowler*, 544 S.W.3d at 849–50.

Both detectives admitted that video's time stamp was inaccurate and that the video footage was discolored. But the fact that the video's time stamp was off does not defeat authentication here. *See, e.g.*, *Bolden v. State*, No. 14-17-00411-CR,

14

2019 WL 1030168, at \*8 (Tex. App.—Houston [14th Dist.] Mar. 5, 2019, pet. ref'd) (mem. op., not designated for publication) (concluding that one-hour time discrepancy did not by itself defeat video's authentication); *Razo v. State*, No. 02-11-00161-CR, 2012 WL 3207271, at \*7 (Tex. App.—Fort Worth Aug. 9, 2012, no pet.) (mem. op., not designated for publication) (holding video was properly authenticated where store employee testified the time was accurate except being off by one hour). Nor does the video's discoloration preclude authenticity here. *Cf. McClinton v. State*, No. 02-02-435-CR, 2003 WL 22725543, at \*2 (Tex. App.—Fort Worth Nov. 20, 2003, no pet.) (per curiam) (mem. op., not designated for publication) (holding that arresting officer's testimony was sufficient to establish the authenticity of video recorded by officer's in-car camera even though the film quality was poor and the frames "jump[ed]"). Both detectives testified about the possible reasons for the video's discoloration, and neither detective doubted the video's authenticity because of its discoloration.

Based on the record before us, we conclude that the trial court's decision—that the State had supplied sufficient facts to allow the jury to reasonably conclude that the video was authentic—was within the zone of reasonable disagreement.[9] *See*

---

[9]Shaw principally relies on *Johnson v. State*, 970 S.W.2d 716 (Tex. App.—Beaumont 1998, no pet.) to support his argument. There, when a child victim was asked whether a recording of her victim interview was accurate, she responded, "'Not everything,' and then said she did not remember it at all." *Id.* at 719. On appeal, the court held that the trial court erred by admitting the video. *Id.*

15

*Butler*, 459 S.W.3d at 600 ("In a jury trial, it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic."); *see also Fowler*, 544 S.W.3d at 849–50; *Standmire*, 475 S.W.3d at 345. That is, the State produced evidence sufficient to support a finding that the video was what it claimed it to be: discolored video footage of the shooting. *See* Tex. R. Evid. 901(a).

We hold that the trial court did not abuse its discretion by admitting the videotape into evidence, and we overrule Shaw's only issue.[10]

### V. Conclusion

Having overruled Shaw's single issue, we affirm the trial court's judgments.

---

Here, however, Jones testified that the video showed what he saw and experienced the day of the shooting and that the video had not been altered or changed from what he remembered. But he later responded "I don't know" when asked whether the video was "a true and accurate copy of the events . . . that occurred that day" because the "colors are messed up" and he was unable "to determine the identity of people on the video." We presume the trial court resolved the conflict in Jones's testimony, if any, in favor of its ruling. Plus, the trial court's ruling did not depend only on Jones's testimony; both detectives provided testimony to authenticate the video. We thus conclude that *Johnson* is inapposite.

[10]We need not address Shaw's remaining arguments regarding harm. *See* Tex. R. App. P. 47.1; *Smith v. State*, No. 09-17-00081-CR, 2018 WL 1321410, at *7 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication) (citing Tex. R. App. P. 47.1; *Morales v. State*, 32 S.W.3d 862, 866 n.7 (Tex. Crim. App. 2000)).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  November 17, 2022