

# NUMBER 13-19-00590-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JESUS ANGEL REBOLLAR,**                                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                          **Appellee.**

---

**On appeal from the 139th District Court
of Hidalgo County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Benavides**

Appellant Jesus Angel Rebollar was convicted of two counts of capital murder and sentenced to life without parole. *See* TEX. PENAL CODE ANN. §§ 12.31, 19.03(a)(7)(A), (a)(8). In three issues, Rebollar argues that (1) the trial court erred by allowing testimony concerning an eyewitness's pre-trial identification of him, (2) the trial court erred by permitting the eyewitness to make an in-court identification of him, and (3) the evidence

was insufficient to find him guilty. We affirm.

## I.    BACKGROUND

At around 6:00 p.m., on November 6, 2016, Hector Garcia and his three-year-old son were shot approximately thirty-six times and six times, respectively, causing their deaths. An eyewitness to the shooting, Jose Eduardo Salinas Jr., called 911 to report the incident while it was in progress. A few hours later, Texas Ranger Roland Villarreal interviewed Salinas in Spanish.

The interview was video recorded and later transcribed and translated into English. During the interview, Salinas described the shooting he witnessed. Salinas said he and his wife were driving home from buying groceries when he noticed something peculiar happening to a nearby truck. Salinas reported that he told his wife, "[L]ook at the truck! It's like the engine is burning." He then saw what he thought was "fire," but he later realized that "[i]t was bullets."

According to Salinas, he then noticed a different truck in front of him. That truck made a three-point turn, or similar maneuver, and during this maneuver Salinas was able to observe one of its passengers. Specifically, Salinas observed a young man in the back passenger seat leaning out of the window and looking over his shoulder directly at Salinas. Salinas later testified that he was the distance of "[a]bout three or four cars" away from the truck when he noticed this individual.

Salinas described the individual to Ranger Villarreal as light-skinned but not "a gringo." He estimated the individual to be a young man of "like some 20 years old. A kid." Salinas also described the young man as having sparse facial hair shaped like his own

2

goatee. He indicated that the young man's hair was "combed like this, backwards" and explained the man was "[w]ell combed, well groomed." Salinas also said that the young man was "wearing a checkered cowboy shirt. Sleeves rolled up like this up here," indicating approximately to his elbow. The shirt was also "checkered with blue and a light color." Salinas described the light checkers as "little gray ones."

Salinas told Ranger Villarreal that he next observed the passengers bringing out rifles, including the individual with whom he made eye contact. Salinas stated that "[he] was looking and [he] saw how they massacred [the victim] right there," using what Salinas described as an "AK-47 with brownish wood." Salinas got a good look at the truck with the gunmen. He noticed it was a "beautiful dark blue" four-door Ford with Texas license plates. The truck was either a "16" or "15 model" and "had blue lights" that "matched the truck." He believed that there were five people inside the vehicle but explained that there were "[f]our at least," because "there were three occupants or more in the back."

On November 8, 2016, Salinas was brought in for a second videotaped interview by Ranger Villarreal, mainly conducted in Spanish. It was also video recorded and later transcribed and translated into English. During this second interview, Ranger Villarreal first showed Salinas a photograph on his computer depicting Rebollar and eight other Hispanic males.

According to Ranger Villarreal, Salinas initially had trouble viewing the photograph due to a glare. In the video, prior to any light adjustment, Salinas pointed to Rebollar and stated, "This is whiter. It's that it looks a little closer to him. That's what I'm looking at. . . . That's what I remember. OK." Ranger Villarreal then adjusted the blinds in the room to

3

reduce the glare. After about ten seconds of viewing the photo without a glare, Salinas then stated, "This one, ah, with the long nose. Yes" and identified Rebollar. Ranger Villarreal then presented Salinas with a Facebook profile titled "El Werito" that contained a photograph of Rebollar with two young girls. Salinas again identified Rebollar as one of the shooters he observed. In English, Salinas stated that he was "85%" sure that Rebollar was the person he observed on November 6, 2016, to which Ranger Villarreal responded, "95%?" Salinas then agreed with this assessment of his level of certainty. Ranger Villarreal showed Salinas a photograph of a different Hispanic male holding a rifle. Salinas denied that this person was the shooter he observed.

Ranger Villarreal testified that about an hour after his interview with Salinas, he learned that the person identified by Salinas was Rebollar. On February 23, 2017, Rebollar was indicted for two counts of capital murder.

On April 30, 2018, and June 5, 2019, Rebollar filed motions to exclude any eyewitness identification evidence. A seven-day jury trial commenced on September 25, 2019. A hearing was held outside the presence of the jury on Rebollar's motions. Both Ranger Villarreal and Salinas testified concerning the pretrial identification procedures, and the trial court viewed both of Salinas's interviews with Ranger Villarreal for the purpose of the hearing. At the conclusion of the hearing, the trial court stated:

> Now, as far as Mr. Salinas is concerned, that's where I'm really, really troubled with the identification of [Rebollar]. . . .
>
> I cannot exclude [Salinas's] testimony. He is going to be allowed to testify. . . .
>
> . . . .

4

But I would like the record to reflect that I was very troubled by the fact that the Texas Ranger [Villarreal] was put in that position. And yes, maybe he should have known better, maybe he should have done something different. But I think the way everything was going so fast that there was a lot of trouble in this situation. And I do not want him admonished in any way because of that. Because I don't think he did anything to really violate his constitutional rights.

The trial court denied the motion to exclude Salinas's eyewitness testimony and granted the motion to exclude another eyewitness.

Dr. Norma Farley, a forensic pathologist, conducted the autopsies of Garcia and his son. Dr. Farley testified at length to each of the bullet wounds that Garcia and his son sustained, and which wounds may ultimately have proved fatal. She concluded the manner of death for both individuals was "homicide."

Ranger Villarreal testified that several articles of clothing were recovered from Rebollar's residence. Specifically, the State recovered a blue shirt and two pairs of underwear that Ranger Villarreal stated Rebollar confirmed were his. Waleska Castro, a trace evidence examiner, testified concerning gunshot residue found on articles of Rebollar's clothing. Castro testified that she found seventeen particles consistent with "primer gunshot residue" on the blue shirt seized by law enforcement and twenty-one total particles consistent with "primer gunshot residue" on the two pairs of Rebollar's underwear. According to Castro, a "primer gunshot residue particle" cannot be found in nature; "[i]t is just produced by the discharge of a firearm."

Salinas told the jury about what he saw on November 6, 2016, identified Rebollar as one of the shooters, and identified the blue shirt law enforcement seized as the same blue shirt he saw Rebollar wearing that day. Salinas also testified concerning his initial

5

identification of Rebollar on November 8, 2016.

Several of Rebollar's friends testified about Rebollar's whereabouts on November 6, 2016. Luis Bazaldua testified that he had been with Rebollar "all day" on November 6, 2016. However, he later acknowledged that there was a period where Rebollar and some friends left without Bazaldua "to go get [a] piece of meat." The State also asked Bazaldua about a conversation he had with investigators.

[STATE]:     Okay. Do you remember telling the rangers . . . that you didn't plan for this to happen?

[BAZALDUA]:  Yes.

[STATE]:     That you didn't know that they were going to kill those people?

[BAZALDUA]:  Yes. What I said is that I didn't know like that was going to happen.

Flor Perez, Rebollar's girlfriend at the time of the incident, also testified as to Rebollar's activity on November 6, 2016. Perez gave two conflicting timelines for the events of November 6, 2016. In one version of events, Perez remembered that Rebollar left around 5 p.m. that day and did not return until about 8 p.m. Perez stated that at the time he left, Rebollar was wearing a "blue with white" shirt.

Dr. Rolando Carol, an expert in legal psychology and eyewitness memory testified to the suggestiveness of the photographic lineup that Salinas viewed. Dr. Carol opined that "[n]one of the recommendations were followed" by law enforcement when conducting the photographic lineup. For instance, Ranger Villarreal did not "give the instruction that the perpetrator may or may not be in the lineup." Dr. Carol also stated that there were "social factors and cognitive factors that would make [him] doubt trusting this particular

6

identification decision," such as the "social dynamics" that discouraged Salinas from correcting Ranger Villarreal when he responded "95%?" to Salinas's "85%" assessment. Dr. Carol's ultimate conclusion was "that [he] would have significant doubts as to the accuracy and reliability of this decision made."

John Kilty, an expert witness in forensic testing also testified on behalf of Rebollar. According to Kilty, Castro's report was deficient. Specifically, Kilty noted that Castro did not test the chemical composition of cartridge cases found at the scene of the shooting against the particles found on Rebollar's clothing.

At the conclusion of his trial, the jury found Rebollar guilty of both counts and he was sentenced to life without parole. This appeal followed.

## II.    EYEWITNESS IDENTIFICATION[1]

By his first issue, Rebollar argues that the trial court abused its discretion by failing to exclude Salinas's pretrial identification of Rebollar because "[t]he process used in this case as well as the contents of the photos" shown to Salinas "were by their very essence impermissibly suggestive, and any eyewitness identification was tainted by an improper procedure." Rebollar argues by his second issue that Salinas's in-court identification was tainted, and should have been excluded, for the same reason. *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999) ("An in-court identification is inadmissible when

---

[1] Generally, an appellate court should first address the issues an appellant raises that would afford him the most relief. *Lopez v. State*, 615 S.W.3d 238, 248 (Tex. App.—El Paso 2020, pet. ref'd). Here, because the admissibility of the eyewitness identification evidence is intertwined with the sufficiency of the evidence, we first address whether the eyewitness identification evidence was admissible. *See In re M.H.*, 319 S.W.3d 137, 143 n.3 (Tex. App.—Waco 2010, no pet.); *see also Kelly v. State*, 529 S.W.3d 504, 510–16 (Tex. App.—Texarkana 2017, no pet.) (addressing the admissibility of eyewitness identification testimony prior to addressing the sufficiency of the evidence).

it has been tainted by an impermissibly suggestive pretrial photographic identification.").

## A.      Applicable Law & Standard of Review

The United States Supreme Court has declined to adopt "the principle that, because of the mere possibility of suggestive procedures, out-of-court statements of identification are inherently less reliable than other out-of-court statements." *United States v. Owens*, 484 U.S. 554, 561 (1988). Ordinarily, the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry*, 565 U.S. at 237; *Balderas v. State*, 517 S.W.3d 756, 791 (Tex. Crim. App. 2016). "Only when evidence is so extremely unfair that its admission violates the fundamental conceptions of justice" does the Due Process Clause of the Constitution implicate further protections for criminal defendants. *Perry*, 565 U.S. at 237 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)) (internal quotations omitted); *Balderas*, 517 S.W.3d at 791. If a witness identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," the resulting identification, whether pretrial or in-court, should be excluded. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Ibarra*, 11 S.W.3d at 195.

It is the defendant's burden to establish by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive. *Balderas*, 517 S.W.3d at 792. However, the Supreme Court has not mandated a per se exclusionary rule when the police do conduct an impermissibly suggestive identification. *Perry*, 565 U.S. at 724.

8

Rather, we are "to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

Therefore, once a court has concluded that a pretrial identification procedure was impermissibly suggestive, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). "If indicia of reliability outweigh suggestiveness then an identification is admissible." *Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995). It is also the defendant's burden of proof to show by clear and convincing evidence that the eyewitness's identification is unreliable. *Brown v. State*, 64 S.W.3d 94, 99 (Tex. App.—Austin 2001, no pet.) (first citing *Barley*, 906 S.W.2d at 33–34; then citing *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); and then citing *Herrera v. State*, 682 S.W.2d 313, 318 (Tex. Crim. App. 1984)).

## B.     Suggestiveness of Photograph Lineup

With respect to the first part of our analysis, "suggestiveness may result from the manner in which the pretrial identification procedure was conducted; the content of the photo array; or the cumulative effect of the procedures and photographs used." *Coleman v. State*, 627 S.W.3d 340, 343 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). The procedure may also "be impermissibly suggestive if the suspect is the only individual in the array who closely resembles the pre-procedure description." *Balderas*, 517 S.W.3d at 794. In conducting our analysis, we review both the evidence adduced at the admissibility hearing and the evidence adduced at trial. *Id.* at 792.

Although the initial photograph shown to Salinas contained a total of nine Hispanic

9

males, both Salinas and Ranger Villarreal confirmed that only Rebollar matched Salinas's description of the shooter. Rebollar argues that by "offering a photograph with multiple males with only one person matching the previous descriptors mentioned by the witness, it in [e]ffect was a one-person lineup." In *Sexton v. Beaudreaux,* the United States Supreme Court noted that it "has held that pretrial identification procedures violated the Due Process Clause only once," but in that case "police used two highly suggestive lineups and a 'one-to-one confrontation'" between the witness and the defendant, "which 'made it all but inevitable that [the witness] would identify [the defendant].'" 138 S.Ct. 2555, 2559 (2018) (quoting *Foster v. California*, 394 U.S. 440, 443 (1969)).

At trial, Salinas referred to Rebollar as "[t]he one that was lighter [in] skin color when they showed me the picture that I saw." Having reviewed the photograph, we observe that Rebollar is noticeably lighter in complexion than the other individuals depicted in the photograph. *See Balderas*, 517 S.W.3d at 794." Regardless, while the better practice is to ensure that the individuals in a photo array match the defendant's description, "it is not essential that all the individuals be identical." *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985). Even if the other individuals "had different shades of skin color, that would not by itself render the lineup impermissibly suggestive." *Clay v. State*, 702 S.W.2d 747, 749 (Tex. App.—San Antonio 1985, pet. ref'd). "Their similarities in appearance," however, "should be adequate to provide a reasonable test for the witness's capacity to reliably identify the perpetrator." *Ford v. State*, 794 S.W.2d 863, 866 (Tex. App.—El Paso 1990, pet. ref'd).

10

All nine subjects in the photograph are Hispanic males, and a majority of the participants are approximately the same height and weight. One of the other individuals in the photograph appears to be of a similar age and has a similar hair style and facial hair style as Rebollar. Therefore, the physical differences between Rebollar and the other individuals in the first photograph alone do not render the pretrial procedure impermissibly suggestive. *See Williams v. State*, 675 S.W.2d 754, 757 (Tex. Crim. App. 1984) (holding that pretrial identification procedure was not impermissibly suggestive where "lineup participants appear[ed] to be younger than appellant," but were "approximately the same height and weight; of the same race; and all ha[d] facial hair similar to that . . . described by [the eyewitness]"); *Turner v. State*, 600 S.W.2d 927, 932 (Tex. Crim. App. 1980) (holding same where "the only two other individuals in the five person lineup with a beard were not physically close to appellant in size and hair color"); *see also Harland v. State*, No. 14-12-00569-CR, 2013 WL 5346432, at *4 (Tex. App.—Houston [14th Dist.] Aug. 27, 2013, no pet.) (mem. op., not designated for publication) ("Any suggestiveness caused by skin color variations in this case was minimal, particularly given that all six men in the photo spread were of the same race; had similar hair styles, facial hair, and clothing; and the photos were similar sizes and taken in front of similar backgrounds.").

Once Salinas confirmed that Rebollar resembled the shooter he had previously witnessed, he was then shown a screenshot of a Facebook profile titled "El Werito" that included a photo of Rebollar and two young girls. In this photo, Rebollar is looking over his shoulder directly at the camera. Salinas again confirmed Rebollar resembled the shooter and explained that "[i]t's that he made a long face, like this, whe[n] he saw me."

11

*See Cantu v. State*, 738 S.W.2d 249, 252 (Tex. Crim. App. 1987) ("Therefore, repeated showings of appellant's picture in several arrays was suggestive."); *Santos v. State*, 116 S.W.3d 447, 452 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("[I]t is generally considered suggestive to show a witness several photographic arrays or lineups in which only the defendant's photograph recurs.").

Ranger Villarreal then showed Salinas a photo of a different individual, not Rebollar, holding an assault rifle. This person also matched the description Salinas gave Ranger Villarreal, although he was not as light in skin color as Rebollar. Salinas denied that this was the person he observed on November 6, 2016. This was the extent to which the record reflects Salinas was asked to identify the shooter he witnessed prior to trial.

Here, we agree that the police procedure was suggestive. However, to breach the threshold into being impermissibly suggestive, the procedure at issue must be both suggestive and unnecessary. *See Perry*, 565 U.S. at 238–39. Exigent circumstances may sometimes necessitate suggestive procedures. *See Simmons*, 390 U.S. at 384–85; *Herrera*, 682 S.W.2d at 318.

Rebollar argues that "[i]n this case, time was not of the essence" and that Ranger Villarreal should have investigated further before showing Salinas the photographs in his possession. However, just as in *Simmons*, when Ranger Villarreal asked Salinas to view the photo in question, "[a] serious felony had been committed" and "[t]he perpetrators were still at large." *See* 390 U.S. at 384; *see also Herrera*, 682 S.W.3d at 318 ("In the case sub judice the police had reason to believe that the appellant was responsible for one, possibly two capital murders."). Ranger Villarreal testified that he received the

12

photographs from the prosecutor "as a tip on people, because [the State] didn't have anything to go on." *See Simmons*, 390 U.S. at 384–85. Based on these facts, we cannot conclude that the procedure in this case was unnecessary. Therefore, because Rebollar has not shown that the pretrial procedure was both suggestive and unnecessary, he has failed to show that the trial court erred by not excluding the resulting identification. *See Perry*, 565 U.S. at 238–39.

## C.  Reliability of Pretrial Identification

Assuming for the sake of argument that the procedure was impermissibly suggestive, the circumstances of this case indicate Salinas's pretrial identification is otherwise reliable. *See Barley*, 906 S.W.2d at 34.

To determine the reliability of the eyewitness's pretrial identification, we consider the following five non-exclusive factors: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200. We "consider the five *Biggers* factors, which are all issues of historical fact, deferentially in a light favorable to the trial court's ruling." *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998). "The factors, viewed in this light, should then be weighed *de novo* against 'the corrupting effect' of the suggestive pretrial identification procedure." *Id.* at 773–74.

### i.  Opportunity to View Suspect

Salinas described the entire incident lasted for a period of "over three minutes."

Although the record does not establish the amount of time Salinas was looking at Rebollar, the length of an encounter is merely a consideration, not a controlling factor. *Delk*, 855 S.W.2d at 706. Salinas confirmed that he had a clear view of the person in the rear passenger seat, there were no obstructions, and it was still light out. Salinas testified he was "[a]bout three or four cars['] distance" from Rebollar at the time. He was close enough to identify that, although Rebollar had facial hair, that facial hair was sparse. Salinas also told Ranger Villarreal he believed he would be able to identify the person he witnessed because "the dude did stare at [Salinas]."

### ii.  Degree of Attention

Unquestionably, quite a lot happened over a short span of time. Salinas attempted to calm his panicked wife, he called 911, and he witnessed a shooting.

However, witnesses who are "more than just casual observers of the crime" have "more reason to be attentive." *Barley*, 906 S.W.2d at 35. During Salinas's initial interview with Ranger Villarreal, he stated multiple times that he was afraid during the incident that he would be met by a stray bullet. He recounted that "because I am a hunter . . . I know that a single bullet can hurt anyone." Since he was driving, he felt he had to consider the direction of the bullets. He told Ranger Villarreal that during the incident he was thinking, "Now, I go this way. . . . Boom! And a bullet's gonna take me." Salinas was not a casual bystander; he felt he was a potential victim. Therefore, he had a reason to be more attentive to the scene in front of him. *See id.*

The record reflects that Salinas did, indeed, pay a great deal of attention to his surroundings. He provided Ranger Villarreal with details not only concerning Rebollar but

14

also concerning the "little truck that was very low" in which Garcia and his son were later discovered, the "beautiful dark blue" truck in front of him, the number of occupants in that truck, the type of rifles the gunmen wielded, the direction of the bullets, and he even described the cleanliness of the "butts of the rifles." The level of detail Salinas gave in his first interview with Ranger Villarreal supports the conclusion that Salinas was attentive during the shooting. *See Delk*, 855 S.W.2d at 706 (stating that the "amount of detail" provided by the witness indicated that she was "very attentive").

### iii.     Accuracy of Description

No argument has been made that Salinas's description prior to the lineup did not match Rebollar. Salinas correctly and accurately detailed Rebollar's skin color, his style of hair, his facial hair, and his approximate age. He also gave a description of the shirt Rebollar was wearing on the date of the incident. We have examined the shirt that was admitted into evidence at trial and can confirm that Salinas's description of the blue shirt matches the blue shirt that belonged to Rebollar. *See Barley*, 906 S.W.2d at 35. (holding that witnesses' descriptions were accurate when "their descriptions were fairly detailed" and included "appellant's clothing and hairstyle").

### iv.     Salinas's Level of Certainty

When confronted with the photograph, Salinas initially stated he was 85% certain Rebollar was the person he saw. Ranger Villarreal then queried "95%?" To which Salinas responded, "Yeah! OK." At trial, Salinas stated he believed that Ranger Villarreal's response of "95%?" was an indication that Ranger Villarreal "probably misunderstood" him. In reviewing the video, we acknowledge that Ranger Villarreal may indeed have

15

heard 95% instead of 85%.

Regardless, Rebollar does not argue that either 85% or 95% is too low a level of confidence to be sufficiently reliable, and we see no reason to make that argument for him. Salinas confirmed at trial that his identification of Rebollar on November 8, 2016, was "from [his] eyesight and from [his] mind," not from the photograph shown to him. In viewing this factor deferentially to the trial court, we conclude that it weighs in favor of Salinas's identification being reliable. *See Delk*, 855 S.W.2d at 707.

### v.     Time Between Crime and Confrontation

Only two days had passed from the time of the incident to the time Salinas identified Rebollar in the photograph he was shown. *See Manson*, 432 U.S. at 115–16. This short time difference indicates Salinas had the ability to make an accurate identification. *See id.* at 116.

### vi.     Conclusion

Although Dr. Carol concluded "that [he] would have significant doubts as to the accuracy and reliability" of Salinas's identification, the trial court was free to disbelieve this witness and reach its own conclusion. *See Dashield v. State*, 110 S.W.3d 111, 116 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Weighing these non-exclusive factors against the corrupting effect of the pretrial procedure, we conclude that no substantial risk of irreparable misidentification was created so as to deny Rebollar due process. *See Ibarra*, 11 S.W.3d at 196. The trial court therefore did not err by allowing evidence of Salinas's pretrial identification to be presented to the jury.

**D.      Reliability of In-Court Identification**

"An in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pretrial photographic identification." *Id.* at 195. We assess the reliability of an in-court identification by weighing de novo six, non-exclusive factors against the corrupting effect of the pretrial procedure. *United States v. Wade*, 388 U.S. 218, 241 (1967); *Brown v. State*, 29 S.W.3d 251, 254 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Specifically, we examine: (1) "the prior opportunity to observe the alleged criminal act"; (2) "the existence of any discrepancy between any pre-lineup description and the defendant's actual description"; (3) "any identification prior to lineup of another person"; (4) "the identification by picture of the defendant prior to the lineup"; (5) any "failure to identify the defendant on a prior occasion"; and (6) "the lapse of time between the alleged act and the lineup identification." *Wade*, 388 U.S. at 241.

We are also permitted to consider the two *Biggers* factors that do not overlap with the six *Wade* factors: (1) the witness's degree of attention, and (2) the level of certainty at the time of confrontation. *Brown*, 29 S.W.3d at 254–55; *Barley*, 906 S.W.2d at 35 n.8. We need not apply the same weight to the factors as the trial court. *Loserth*, 963 S.W.2d at 774.

**i.      *Biggers* Factors**

Our analysis of three of the *Biggers* factors that overlap with the *Wade* factors remains the same: Salinas had a relatively close and unobstructed view of Rebollar for an indeterminate period of time, Salinas's description of the shooter he observed matched Rebollar's actual description, and Salinas paid close attention to his surroundings during

17

the shooting. However, unlike his pretrial identification, Salinas did not express any level of doubt after identifying Rebollar at trial.

Additionally, by the time Salinas identified Rebollar at trial, almost three years had passed since November 6, 2016. Regardless, this amount of time does not by itself mandate the suppression of Salinas's in-court identification. *See Aviles-Barroso v. State*, 477 S.W.3d 363, 390 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (holding in-court identification admissible despite lapse of time of twenty years); *Palma v. State*, 76 S.W.3d 638, 644 (Tex. App.—Corpus Christi–Edinburg 2002, pet. ref'd) (holding in-court identification admissible despite lapse of time of eight years).

### ii. Remaining *Wade* Factors

Besides his in-court identification, the only other identification of Rebollar by Salinas was his pretrial identification. Salinas identified Rebollar as the shooter he observed in both photos of Rebollar he saw. Salinas was also shown a photo of an individual who was not Rebollar and did not identify this person as the shooter he observed. At trial, Salinas confirmed that his in-court identification of Rebollar came from "what [he] saw on November 6th," rather than the photograph he observed.

The only factors that weigh against admissibility are the length of time between the incident and confrontation and perhaps the opportunity to observe the shooter. In weighing these factors against the corrupting effect of the pretrial identification procedure, we again conclude that the trial court did not err by permitting Salinas's in-court identification of Rebollar. *See Brown*, 29 S.W.3d at 255.

We overrule Rebollar's second issue.

18

### III. SUFFICIENCY OF THE EVIDENCE

Rebollar asserts "that there was insufficient evidence to sustain his conviction for two counts of capital murder because viewing all the evidence in [the] light most favorable to the verdict, no rational jury could have found beyond a reasonable doubt that he committed the offense alleged."

### A. Standard of Review & Applicable Law

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.*

In reviewing evidence for sufficiency, we consider all of the evidence presented in the light most favorable to the verdict to determine whether the jury was justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We defer to the jury's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Id.*

In this case, Rebollar was charged with two counts of capital murder. Specifically, the indictment alleged that Rebollar "intentionally and knowingly cause[d] the death of an

individual . . . younger than 10 years of age" and that he "intentionally and knowingly cause[d] the death" of two individuals and "both murders were committed during the same criminal transaction." *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A), (a)(8).

## B. Analysis

It is undisputed that Garcia and his three-year-old son were shot collectively over forty times. The autopsies for both Garcia and his son ruled the manners of death for both were "homicide." As we have discussed, the evidence in this case included Salinas's properly admitted eyewitness testimony identifying Rebollar as one of the individuals who "massacred" Garcia and his son. In his first interview with Ranger Villarreal, Salinas described the individuals shooting at Garcia's vehicle as "hungry to shoot" and that they "were relishing" the activity. *See id.* § 6.03(a) ("A person acts intentionally, or with intent, . . . when it is his conscious objective or desire to engage in the conduct or cause the result."); *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982) ("Intent can be inferred from the acts, words, and conduct of the accused.").

Perez testified that Rebollar was wearing a "blue and white" shirt when he left around 5 p.m. on November 6, 2016. Although Bazaldua testified that Rebollar had gone with a few friends to "get [a] piece of meat" around that time, the jury was free to believe Salinas's version of events—namely, that Rebollar was shooting Garcia and his son around 6 p.m. *See Chadwick v. State*, 277 S.W.3d 99, 107 (Tex. App.—Austin 2009), *aff'd*, 309 S.W.3d 558 (Tex. Crim. App. 2010). The blue shirt Rebollar confirmed as his also matched Salinas's description and contained seventeen particles that yielded positive results for gunshot primer residue. In viewing this evidence in the light most

20

favorable to the jury's verdict, we conclude that the evidence was sufficient to show that Rebollar is guilty of two counts of capital murder. *See Brooks*, 323 S.W.3d at 899.

We therefore overrule Rebollar's third issue.

### IV. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
30th day of June, 2022.

21